Barrett S. Litt, SBN 45527
E-Mail: blitt@littlaw.com
LITT, ESTUAR, HARRISON & KITSON, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114
Facsimile: (213) 380-4585

Ronald O. Kaye, SBN 145051
David McLane, SBN 124952
Marilyn E. Bednarski, SBN 105322
Email: rok_kmb@earthlink.net
KAYE, McLANE & BEDNARSKI LLP
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiff Thomas Goldstein

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS GOLDSTEIN,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LONG BEACH, et al.,<br><br>Defendants. | CASE NO CV 04-9692 AHM (E)<br><br>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUES OF WHETHER CERTAIN IDENTIFIED INFORMATION ALLEGEDLY WITHHELD WAS EXCULPATORY AND MATERIAL UNDER THE STANDARDS OF *BRADY V. MARYLAND;* MEMORANDUM OF LAW IN SUPPORT THEREOF [FILED CONCURRENTLY WITH SEPARATE STATEMENT OF UNDISPUTED FACTS; DECLARATIONS; EXHIBITS]<br><br>Hearing Date:   November 16, 2009<br>Hearing Time:   10:00 A.M.<br>Courtroom:      14<br>Trial Date:     April 13, 2010 |

TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................1

II.   STATEMENT OF FACTS .......................................................................2

      A.   The Murder of John McGinest ..................................................2

      B.   Testimony of Loran Campbell .................................................3
           1.   Mr. Campbell's Trial Testimony .....................................3
           2.   Mr. Campbell's Habeas Testimony .................................4
           3.   The Foregoing Information Was Not Disclosed to
                the Prosecutor or the Defense. .........................................5

      C.   Testimony Of Eddie Fink ..........................................................6
           1.   Testimony of Edward "Eddie" Fink at Trial and at the
                Preliminary Hearing. .......................................................6
           2.   Fink Made a County Lid Deal With the Prosecution, Which
                Included that the Long Beach Detectives Would Send a Letter
                Requesting a County Lid In Exchange for His Testimony, on
                December 5 ........................................................................7
           3.   Mr. Fink Testified Falsely Regarding Benefits and His
                Expectation of Benefits at Both the Preliminary Hearing and the
                Trial, and the Falsity of the Testimony Was Not Called to the
                Prosecutors' Attention. ...................................................10

      D.   Evidence Regarding Mr. McGinest's Involvement in Selling Drugs
           and Possession of Money was Known to Defendants Independent of
           Eddie Fink: Lester Hogan and Carlton Smith. .......................12

III.  ASSUMING DEFENDANTS KNEW AND FAILED TO PROVIDE TO
      THE PROPER PROSECUTORIAL AUTHORITIES THE INFORMATION
      SET FORTH IN THE STATEMENT OF FACTS, THEIR ACTIONS
      VIOLATED *BRADY V. MARYLAND* BECAUSE THE INFORMATION,
      INDIVIDUALLY AND COLLECTIVELY, WAS BOTH EXCULPATORY
      AND MATERIAL. .....................................................................14

      A.   Evidence Of Agreement For Testimony In Exchange For Lenient
           Sentencing Was Exculpatory & Material. ...............................15
           1.   The Fink Agreement Was Favorable Impeachment Evidence.........15
           2.   The Fink Agreement Was Material. .................................17

B.   Evidence That Mcginest Was A Drug Dealer And Was In
Possession Of Substantial Money At The Time Of His Murder
Was Exculpatory & Material..................................................................20

C.   Evidence Impeaching Loran Campbell's Identification Testimony
Was Exculpatory & Material...............................................................22
1.   Evidence Impeaching Campbell's ID Was Exculpatory................22
2.   Evidence Impeaching Campbell's ID Was Material.....................23

IV.   CONCLUSION...........................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Fulinante*
   499 U.S. 279 (1991)................................................................ 18

*Banks v. Dretke*
   540 U.S. 668 (2004)........................................................... 17, 23

*Bernal-Obeso*
   989 F.2d 331 (9th Cir. 1993) ................................................ 17

*Benn v. Lambert*
   283 F.3d 1040 (9th Cir. 2002) ..................................... 16, 17, 18, 20, 23

*US v. Blanco*
   392 F.3d 382 (9th Cir. 2004) ......................................... 15, 22

*Brady v. Maryland*
   373 U.S. 83 (1963)............................................................ 1, 14

*Burge v. Parish of St. Tammany*
   187 F.3d 452 (5th Cir. 1999) .................................................. 22

*Carriger v. Steward*
   132 F.3d 463 (9th Cir. 1997) ............................................. 18, 23

*Giglio v. United States*
   405 U.S. 150 (1972).......................................................... 15, 23

*D'Ambrosio v. Bagley*
   2006 WL. 1169926 (N.D. Ohio 2006)............................................ 20

*Simms v. Cupp*
   354 F. Supp. 698 (D. Oreg. 1972) ........................................... 23

*Hayes v. Brown*
   399 F.3d 972 (9th Cir. 2005) ............................................... 19

*Hernandez v. City of El Paso*
 2009 WL. 2096272 (W.D. Tex. 2009) ........................................................ 21, 23

*Horton v. Mayle*
 408 F.3d 570 (9th Cir. 2005) ........................................................ 15, 19

*Hovey v. Ayers*
 468 F.3d 892 (9th Cir. 2006) ........................................................ 14

*Jackson v. Brown*
 513 F.3d 1057 (9th Cir. 2008) ........................................................ 15, 16, 18

*Killian*
 282 F.3d 1204 (9th Cir. 2002) ........................................................ 17

*Kyles v. Whitley*
 514 U.S. 419 (1995) ........................................................ 17, 23

*Lindsey v. King*
769 F.2d 1034 (5th Cir. 1985) ........................................................ 24

*Montgomery v. Bagley*
__ F.3d __, 2009 WL. 3075609 (6th Cir. 2009) ........................................................ 21, 23

*Newsome v. McCabe*
 265 F.3d 747 ........................................................ 22

*Paradis v. Arave*
 130 F.3d 385 (9th Cir. 1997) ........................................................ 20

*Robinson v. Cain*
 501 F. Supp. 2d 399 (E.D. La. 2007) ........................................................ 21, 22

*Silva v. Woodford*
 279 F.3d 825 (9th Cir. 2002) ........................................................ 24

*Singh v. Prunty*
 142 F.3d 1157 (1998) ........................................................ 16, 18, 23

*Strickler v. Greene*
 527 U.S. 263 (1999) ........................................................ 14, 17

*US v. Bagley*
  473 U.S. 667 (1985)................................................................ 17

*US v. Butler*
  567 F.2d 885 (9th Cir. 1978) ............................................. 16

*US v. Shaffer*
  789 F.2d 682 (9th Cir. 1986) ............................................ 15

*United States v. Brownlee*
  454 F.3d 131 (3d Cir. 2006) ............................................. 24

*Watkins v. Sowders*
  449 U.S. 341 (U.S. 1981) ................................................. 23

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

After consultation with defendants in compliance with Local Rule 7-3, Plaintiff brings this motion for partial summary judgment on issues in this case related to *Brady v. Maryland*, 373 U.S. 83 (1963). In this motion, we assume, but do not seek summary judgment on, defendants' failure to disclose to the Goldstein prosecutors exculpatory evidence known to the Long Beach defendants (Miller, Collette, MacLyman, Wren, and the City). We assume them (although they are disputed) for the purpose of allowing a determination whether the allegedly undisclosed information was exculpatory and material under *Brady* as a matter of law. This motion seeks to have the court determine that certain, specified pieces of information that we contend were withheld from the Goldstein prosecutors were exculpatory and material under *Brady*. These are pure legal issues, as there are no disputed facts regarding their existence (as opposed to disclosure).

Specifically, plaintiff seeks a determination that the following items were exculpatory and material *Brady* material that had to be provided to the defense. We realize that defendants contest these allegations in numerous respects, but there is ample evidence in the record regarding each of them.

1)    The fact that Mr. McGinest had a substantial amount of money on him at the time of his murder, and that Mr. McGinest was involved in dealing drugs. (This encompasses the absence of information regarding interviews with Lester Hogan and Carlton Smith.)

2)    The letter sent by Deputy Chief William Stovall to the District Attorney's Office recommending a County lid for Eddie Fink.

3)    The actual terms of the deal worked out between the prosecutor and Mr. Fink, which was that Fink would receive a County lid in exchange for his Goldstein testimony.

1

4)   The fact that Eddie Fink's testimony at the preliminary hearing, and at trial, that he expected to receive no benefit in exchange for his testimony, and that he did not receive a benefit in exchange for his testimony, was contrary to Fink's negotiations and his deal with the Fink prosecutor.

5)   The fact that Eddie Fink testified that he had not received benefits in the past for his cooperation with law enforcement when, in fact, he had.

6)   The fact that one or more defendants steered Loran Campbell toward his identification of Mr. Goldstein, including by a) pointing out Mr. Goldstein to Mr. Campbell as the police's suspect before Mr. Campbell made his initial identification; and b) advising Mr. Campbell before his testimony that Mr. Goldstein had failed a polygraph, had taken a post-murder trip to Las Vegas, and that police were confident that Mr. Goldstein was the murderer.

7)   The fact that Mr. Campbell told one or more defendants after he testified that he recalled having met Mr. Goldstein before the night of the murder .

8)   The fact that one or more defendants communicated to Eddie Fink information known to them regarding the murder of John McGinest.

## II.   STATEMENT OF FACTS

### A.   THE MURDER OF JOHN MCGINEST

On November 3, 1979, at approximately 10:20 p.m., John McGinest, a 25 year old African-American man, was killed by four shotgun blasts. The police found the body of Mr. McGinest lying in the intersection of 12th Street and Pine

Avenue in the City of Long Beach. There were four shotgun shells found in the vicinity of the body. Ex. 1514[1], pp.13--16 (11/3/79 Police Report).

The detectives originally assigned to the homicide investigation were John Henry Miller and William Collette. Mr. Miller's regular partner at the time was William MacLyman, who was out of town at the time of the murder. Ex. 1704, (Collette D. Tr., pp.79:23--80:2). Each of the four defendants played an active role in one or another phase of the investigation. See, e.g., Ex. 1514 (Murder Book reflecting activities of each defendant in the Goldstein investigation).

Under circumstances subsequently described, Mr. Goldstein was eventually identified by eyewitness Loran Campbell and arrested. While arrested, he was housed with, among others, Eddie Fink. The two key witnesses at Mr. Goldstein's criminal trial were Loran Campbell and Eddie Fink.

### B.   TESTIMONY OF LORAN CAMPBELL

#### 1.   *Mr. Campbell's Trial Testimony*

Loran Campbell lived on the east side of Pine Street, just south of 12th Street. He testified at trial that he heard a shot, looked out his bedroom window, but did not see anything. He then looked out the living room window and saw a man holding a shotgun and running south on Pine. The person was approximately 15 feet away from the window, and Mr. Campbell saw him for about two or three seconds. He did not see where the man ran to. Ex. 1520, pp.26:12-27:16; 28:1-7, 23-28.

On November 15, 1979, Mr. Campbell went to the police station and viewed a photo spread. During the photo spread, he pointed to Mr. Goldstein and stated, "That looks like the man. I'm not sure and I'm not positive, but that looks like him." Ex. 1514, p.25. Mr. Campbell described the man as being Caucasian, approximately 5'9" to 5'10", and maybe 160 pounds. He described the man's hair

---

[1] For ease of reference, combined exhibits will be submitted for both the *Brady* MSJ and the *Monell* MSJ. The exhibits will be in numerical order attached to a declaration of

as dark and medium in length; it was a "neat haircut." He stated that he could not say for sure it was an "Afro" style haircut, but that it was close and neat like an Afro. He believed the man to be in his early twenties. Ex. 1520, pp.27:12-16; 41:18 – 42:25.

The Detectives who conducted the photographic lineup were Detectives Miller and MacLyman. Ex. 1711, p. 94:14-21 (MacLyman D. Tr.)

Mr. Campbell testified that he had never before seen the man who ran down the street that night. At trial, he positively identified Mr. Goldstein as the person he saw running from the murder scene. Mr. Campbell was the only witness at trial who identified Mr. Goldstein from the November 3, 1979, incident. Ex. 1520, pp.27: 17-18; 56:24-28.

### 2. Mr. Campbell's Habeas Testimony

On May 21, 2002, Mr. Campbell testified on behalf of Mr. Goldstein at an evidentiary hearing on Mr. Goldstein's federal habeas corpus proceeding. Ex. 1406, pp.29-54. Mr. Campbell testified that, on November 15, 1979, he was asked by police officers to look at photographs of suspects. Ex. 1406, p.31:9-16. He stated that he looked at the photographs once or twice but did not recognize anyone from the group of photographs. In response, one officer selected Mr. Goldstein's photograph from the group, and asked Mr. Campbell if the person in the photograph could have been the person he saw running on the night of November 3, 1979. Mr. Campbell stated that it was possible, but he was not sure. In response, the police officer told Mr. Campbell that Mr. Goldstein was the suspect for the murder. Ex. 1406, pp.31:22 – 33:2

At the habeas evidentiary hearing, Mr. Campbell testified that, after learning that Mr. Goldstein was the suspect, and prior to what he believes was the preliminary hearing, the Long Beach Police – including specifically Officer Miller – told him there "was one other gentleman they got that had seen him [Mr.

Barrett Litt.

4

Goldstein] but they weren't too sure about his testimony. They also told me that Mr. Goldstein had failed a lie detector test and they felt he was definitely the person that had committed the crime." Ex. 1406, p.33:9-25

Mr. Campbell also testified that, before his trial testimony, the police officers advised him that "some friends had said [Mr. Goldstein] had went [sic] to Las Vegas and spent a lot of money; and when he came back, he was bragging about it to some friends or something at a party or something, in a garage or something." Ex. 1406, p.34:1-10.

Mr. Campbell testified that he in fact did not recognize Mr. Goldstein in the courtroom as the person he saw on November 3, 1979, although he testified otherwise. Mr. Campbell picked out Mr. Goldstein during the murder trial based solely on where Mr. Goldstein was sitting in the courtroom. Ex. 1406, pp.34-11 – 35:9

In the 2002 evidentiary hearing, Mr. Campbell explained why he testified at trial as he did. Mr. Campbell stated that he was "a little overanxious to help out" the police. He testified that he chose Mr. Goldstein based on what the police had told him and his desire to be a good citizen and help out law enforcement. However, that testimony was not based on his eye-witnessing the events of November 3, 1979. He believed the police had done a good investigation, and he wanted to assist them. Ex. 1406, p.36:2-23.

Mr. Campbell then testified that he was "intimidated" by the officers' status as police officers. He was, therefore, too embarrassed to mention in the courtroom during the trial or the preliminary hearing, that the officers had picked out the photograph of Mr. Goldstein for him. He said that he was afraid to testify truthfully at the preliminary hearing and the trial about the police officer's selection of Mr. Goldstein at the photographic lineup. Ex. 1406, pp.37:12 – 38:9

     *3.*    *The Foregoing Information Was Not Disclosed to the Prosecutor or the Defense.*

Defendants deny Mr. Campbell's description of events at the habeas hearing. The first record of any such information coming to the attention of either the prosecution or Mr. Goldstein is statements Mr. Campbell made to Mr. Goldstein's habeas attorneys and investigators. Thus, if the trier of fact were to conclude that Mr. Campbell's version of the facts is accurate, it is undisputed that it was not provided to the prosecutor or the defense. Declaration of Barrett S. Litt, ¶4 (hereafter "Litt Dec."); Ex. 1406, pp.29:13--38:9 (Campbell habeas testimony).

C. **TESTIMONY OF EDDIE FINK**

1. *Testimony of Edward "Eddie" Fink at Trial and at the Preliminary Hearing.*

Edward Fink was arrested on November 18, 1979. He was placed into the Long Beach City Jail. Fink testified that he had been arrested about 9 or 10 times in Long Beach prior to the trial. He also testified that he had been convicted of a felony several times in the past. Ex. 1520, pp.296:6—309:13. Fink had been used by the Long Beach Police Department as an informant for the previous 9-10 years, probably more than 20 times. See Ex. 1520, p.418 (murder trial testimony of Det. Paul Chastain).

On November 19, 1979, after his first night in jail, Fink called the Long Beach Police Department to inquire who was handling the Goldstein case. He was directed to, and spoke with, either Detective Wren or Collette, he could not recall which. Ex. 1520, pp.348:15-26; 349:7-13. Fink met with Detectives Wren and Collette on November 19, 1979. Ex. 1520, pp.350:21-27. That interview was not tape recorded (Ex. 1704, p.224:4-6 (Collette D. Tr.)), nor are there any notes or reports reflecting the content of the discussion that occurred that day. Litt Dec., ¶5. Fink returned to the Goldstein cell on November 19, and spent that night with him as well. Ex. 1520, p.352:16-17. Fink was subsequently tape recorded by Detectives Wren and Collette the following day, on November 20, 1979. Ex. 1091, p.91:5-17 (Transcript of Fink's trial testimony). It was at this meeting that the only

6

documented evidence of Mr. Goldstein's "confession" exists. There is a tape recorded interview between Fink and Detectives Collette and Wren. Ex. 1514, 39-40; Ex. 1032 (transcript of Fink interview).

At trial, Fink testified that he and Mr. Goldstein talked "all night" about Mr. Goldstein's case while in the custody of the Long Beach Police Department, on the night of November 18 or 19, 1979. Ex. 1091, p.33:22-27 Fink testified that Mr. Goldstein allegedly told him that the victim, Mr. McGinest, owed him money. Ex. 1091, pp.11:18-28; 48:14-22. This provided the prosecution with evidence of motive. Other than Fink's testimony, there was no other evidence that Mr. Goldstein ever had any contact with Mr. McGinest. Litt Dec., ¶6; Ex. 1520 (Trial transcript).

According to Fink, Mr. Goldstein confessed that, on the night of the murder, Mr. McGinest and Mr. Goldstein had an argument over money, and Mr. Goldstein shot at Mr. McGinest while McGinest was running down the alley. Fink claimed that Mr. Goldstein confessed he was trying to "scare" the victim, but he mistakenly hit him. Fink initially testified that Mr. Goldstein did not state how much money Mr. McGinest owed him. He later changed his testimony, said the amount was $1500, and again changed his testimony saying that Mr. Goldstein did not indicate the amount. Ex. 1091, pp.12:1-8; 13: 5-25; 48:14-28; 49:20—50:11; 51:19--52:1.

Fink testified that Mr. Goldstein told him that he sold his shotgun a couple of days before he was arrested. Ex. 1091, pp.14:24-28 – 15:7. Fink also testified that, about a week after the incident, Mr. Goldstein had gone into the alley in front of the garage and had shot the shotgun at night. Mr. Goldstein supposedly told him "something about the blind old lady across the alley seeing him but she was blind anyway so she couldn't tell." Ex. 1091, 15:8—16:3

2.    *Fink Made a County Lid Deal With the Prosecution, Which Included that the Long Beach Detectives Would Send a Letter Requesting a County Lid In Exchange for His Testimony, on December 5 .*

7

When placed in Mr. Goldstein's cell, Fink was charged with Grand Theft. Ex. 1027. On December 5, 1979, Mr. Fink waived preliminary hearing in his pending Grand Theft case, and the matter was set over for a hearing on December 19. Ex. 1035. At that time, it was anticipated that Fink would plead guilty to the charge pending against him, with a DA recommendation of a County lid (i.e., a sentence not to exceed one year in the County Jail). Ex. 1035, pp.7-8. The County lid recommendation was conditional upon Mr. Fink's cooperation in a manner that was implied but not explicit on the record This is reflected in the following statement made to Mr. Fink on the record by Deputy District Attorney Kenneth Jeffers, who was the prosecutor in *People v. Fink*, A020750:

> "You [Fink] understand, don't you, that we, or our office, would be able to approach the Judge at sometime and tell him that things haven't worked out quite the way we thought and we don't think the Judge can go along with the County lid offer, if you know what I mean?" Ex. 1035, pp.7-8.

On the same date (December 5, 1979), Deputy District Attorney Kenneth Jeffers entered a note into the District Attorney's file in *People v. Fink*, A020750, which memorialized the agreement with Fink, and the fact that one of the Goldstein detectives, William Collette, would obtain a letter from his captain regarding the County lid agreement. The note reads,

> "The defendant waived his right to a prelim & we certified the case to Dept. J for 12-19-79. The defendant then will p/g with an offer from us of a co-lid [County lid]. This was promised on the record. Investigator Collette will furnish us a letter from his capt re co-lid." Ex. 1028.

A County lid was a clear benefit to informant Fink, given that he was charged with a felony and had a long criminal history. Defendant Collette arranged the deal with Deputy District Attorney Jeffers, as reflected in Jeffers' note. Ex. 1028. It was the practice of the detectives to try to share everything of significance to an investigation among partners, including such matters as discussions with the DA or writing letters like Ex. 1026. Ex. 1704, pp.61:22--62:14; 66:23--67:20;

8

183:14-24 (Collette D. Tr.). Each of those assigned to an investigation would be responsible to ensure that *Brady* material reached the case prosecutor. Thus, Plaintiff will argue that Detective Miller would have known of the deal.

Pursuant to the agreement of December 5, Defendant Collette drafted a letter to the District Attorney's Office on behalf of Deputy Chief W.F. Stovall of the Long Beach Police Department recommending a County lid for Fink. On December 13, 1979, Deputy Chief Stovall signed the letter addressed to Ron Ross, Head Deputy of the Long Beach Office of the Los Angeles County District Attorney's Office with regard to a County lid recommendation for Fink. Ex. 1026. Although the letter is signed by Chief Stovall, it was written by William Collette, whose initials appear at the bottom left where the initials of the author typically appear. Ex. 1704, p.166:7-11 (Collette D. Tr.). That letter states:

> "Homicide Investigators W.B. Collette and Logan Wren indicate that Edward Fink is to be used as a witness in an upcoming homicide case wherein he obtained admissions from the alleged suspect. It is suggested that a County sentence would be appropriate in this case." Ex. 1026.

It is a disputed fact whether this information was ever disclosed to any prosecutor in the Goldstein case. The Deputy District Attorney for the Goldstein prosecution was Kurt Seifert. Mr. Seifert testified at deposition that he was unaware of any benefits or promises of benefits to Fink when he testified at the preliminary hearing. Ex. 1745, pp.33:9--35:25 (Seifert D. Tr.). Had he been aware that Fink's testimony was false, he would have called it to the court's attention and taken Fink on voir dire. *Id*. In contrast, Detective Collette claims that Mr. Seifert was aware of the Fink deal, and that Collette and Seifert met with Ron Ross in arranging it. Ex. 1704, pp.178:2--180:14 (Collette D. Tr.). Mr. Ross was the head of the Long Beach District Attorney's Office at the time, and the intended recipient of Ex. 1026, the letter recommending a County sentence for Fink.

On December 19, 1979, Mr. Fink entered a guilty plea in Case No. A020750. He received a sentence of summary probation, and 58 days in jail with credit for time served, to be served in the Long Beach City Jail. Ex. 1043. This was an extremely favorable outcome for Fink, attributable directly to his role as a witness in the Goldstein case. Fink received this sentence despite his lengthy criminal record, previous confinement in state prison for theft, and the fact that he was on parole at the time he committed the grand theft offense. This sentence was received two days after Fink testified at the Preliminary Hearing.

>   3.   *Mr. Fink Testified Falsely Regarding Benefits and His Expectation of Benefits at Both the Preliminary Hearing and the Trial, and the Falsity of the Testimony Was Not Called to the Prosecutors' Attention.*

At the preliminary hearing of December 17, 2009, Fink testified as a witness for the prosecution. Defendant Miller was the investigating officer assigned to sit at counsel table during the preliminary hearing. He was identified by Fink as sitting at counsel table during his testimony. Ex. 1522, p.54; Ex. 1745, pp.20:21--21:21 (Seifert D. Tr.). During the preliminary hearing, Fink testified that he had no expectation of a benefit for his testimony in the Goldstein case. Specifically, the following exchange occurred during the cross-examination of Mr. Fink:

> "Q. ANY PROMISES MADE TO YOU AT ALL, SIR, IN REFERENCE TO PROVIDING THIS INFORMATION?
>
> "A. NO
>
> "Q. YOU DON'T EXPECT TO GET ANYTHING FROM THIS, DO YOU, SIR?
>
> "A. I DON'T KNOW.
>
> "Q. WHAT DO YOU MEAN YOU DON'T KNOW?
>
> "A. I DON'T KNOW.
>
> "Q. ARE YOU EXPECTING TO GET A BREAK ON YOUR CASE?

10

"A. I DON'T KNOW.

"Q. HAS A BREAK BEEN PROMISED YOU?

"A. I HAVEN'T GOT A BREAK YET."

Ex. 1522, pp.63:23--64:9

Defendant Miller was the assigned investigator who sat at counsel table for the Preliminary Hearing. Ex. 1745, pp.20:21--21:21 (Seifert D. Tr.). Defendant Miller was specifically pointed out as sitting next to prosecutor Kurt Seifert only a few minutes before the testimony recited above. See Ex. 1522, p.54:1-10 (prosecutor Seifert, in questioning Eddie Fink, refers to John Henry Miller as "the gentleman sitting next to me").

Defendant Miller did not advise Kurt Seifert that Fink had testified falsely, and that he was receiving a County lid recommendation conditioned upon his testimony in the Goldstein case, even after Fink testified falsely as recited above. Mr. Seifert has testified that he never learned this, which he can determine because he would have placed a note in the file if he had. Ex. 1745, pp.36:19--37:23 (Seifert D. Tr.). Lorenzo Pereyda, Mr. Goldstein's defense attorney, testified that he never learned this, and never learned of Ex. 1026. Ex. 1406, pp.23-27 (Pereyda testimony at habeas evidentiary hearing)

Subsequently, similar testimony occurred at Mr. Goldstein's trial in which Deputy District Attorney Tim Browne was the prosecutor. Mr. Miller again acted as the investigating officer and sat at counsel table during trial. See, e.g., Ex. 1520, p.464:26-28. Fink again testified falsely regarding the benefits he received:

"Q. YOU HAVE NEVER BARGAINED WITH THE POLICE?

"A. OH, I HAVE, BUT IT NEVER WORKED.

"Q. IT'S NEVER WORKED AT ALL, IS THAT CORRECT, SIR" ?

"A. I WENT TO PRISON EVERY TIME.

"Q. DID IT WORK THIS TIME?

11

"A. NO.

"Q. IT DID NOT WORK AT ALL?

"A. NO."

Ex. 1520, pp.514:20--515:3

Defendant Miller again failed to advise the prosecutor of this false testimony. Mr. Browne has testified that he never learned of the false testimony. Ex. 1744, pp.55:5--56:21 (Browne D. Tr.).

**D.** **EVIDENCE REGARDING MR. MCGINEST'S INVOLVEMENT IN SELLING DRUGS AND POSSESSION OF MONEY WAS KNOWN TO DEFENDANTS INDEPENDENT OF EDDIE FINK: LESTER HOGAN AND CARLTON SMITH.**

A central argument for bolstering and confirming Mr. Fink's reliability was the prosecution's argument that Fink could only have learned about Mr. McGinest having money from Mr. Goldstein. Although there is no transcript of the prosecution's closing argument, that was a central tenet of the prosecution's position in the case. Declaration of Thomas Goldstein; Ex. 1520, pp.836:18--837:12 (Goldstein new trial motion, during which the court states that it spoke with the jurors after the verdict, and one of the things that influenced the jury was that "they found that witness Fink could not have known of certain facts related to the jury by him unless he had been told those facts by the defendant"); Ex. 1521, pp.23-24 (prosecutor notes stating, although in reference to what piece of information is not clear, "Where would he [Fink] have gotten that information if not from defendant").

Further, there was no evidence at the trial regarding the fact that Mr. McGinest was involved in selling drugs, specifically marijuana. Litt Dec., ¶7; Ex. 1520. There are no notes or documents of any kind from the Long Beach Police Department regarding the fact that the police had information on this issue, or its source. Litt Dec., ¶7.

12

It has been learned in the course of discovery that the investigating detectives learned both that Mr. McGinest was involved in selling drugs, and that he had a substantial amount of money on him at the time of his murder. They knew this because detectives conducted two witness interviews, neither of which was disclosed to the prosecution or the defense. The first interview was with Lester Hogan, now a parole officer. Detectives interviewed Mr. Hogan shortly after the murder. He was aware at the time of that interview that Mr. McGinest had recently been involved in dealing drugs and, on the day of his murder, had a large amount of money on him. Mr. Hogan has testified that he "probably" told the police this information. Ex. 1740, pp.24:18--28:19; 30:15--33:3 (Hogan D. Tr.).

That Mr. Hogan, or someone else, gave defendants this information is demonstrated by the arrest of Carlton Smith on November 16. Mr. Smith lived near 12th and Pine, and told an officer on the day of his arrest that he had witnessed the McGinest murder. Ex. 1505. The booking officer for Smith, Officer Albert George, sent a memo to Detectives Miller and MacLyman that Smith said he witnessed events related to the murder. *Id*. This kind of information should, and ordinarily would have been, followed up. Ex. 1700, pp.156:7--157:1 (Miller D. Tr.); Ex. 1705, p.355:37-10 (Collette D. Tr.).

Carlton Smith was interviewed and questioned in the jail by two detectives within a day of his arrest Ex. 1742, p.87:5-131 (Smith D. Tr.). During questioning, they stated that McGinest was in the "same business" as Smith, which Smith understood to mean drugs as he had been arrested for possession of marijuana for sale. *Id*., pp.87:14--88:18. The police also told Smith that Mr. McGinest had "like $1200" in his pocket when he was murdered. *Id*., p.135:6-17.

Defendants never memorialized the interviews with Smith and Hogan to the prosecutors, or to the defense. There are no reports or notes regarding either interview, or their having obtained this information from sources other than Mr. Fink. Litt Dec., ¶8. As best as can be determined, defendants never told the

13

prosecutors or the defense that they knew Mr. McGinest was involved in the sale of drugs, and that he had a large amount of money on him, before they ever had contact with Eddie Fink. Litt Dec., ¶8. These pieces of information were critical exculpatory information because 1) it meant that Fink could have gained knowledge attributed solely to Mr. Goldstein from the defendants, and 2) it provided an alternative theory to the one presented by the prosecution, i.e., of a drug deal gone bad. There was never any evidence presented at trial or known to defendants that Mr. Goldstein was involved with drugs.

**III.   ASSUMING DEFENDANTS KNEW AND FAILED TO PROVIDE TO THE PROPER PROSECUTORIAL AUTHORITIES THE INFORMATION SET FORTH IN THE STATEMENT OF FACTS, THEIR ACTIONS VIOLATED *BRADY V. MARYLAND* BECAUSE THE INFORMATION, INDIVIDUALLY AND COLLECTIVELY, WAS BOTH EXCULPATORY AND MATERIAL.**

*Brady v. Maryland*, 373 U.S. 83 (1963), establishes that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady* at 87. There are three essential components to a *Brady* claim. (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the State; (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263 (1999). To determine whether prejudice existed, courts look to the materiality of the allegedly suppressed evidence. *Hovey v. Ayers*, 468 F.3d 892, 916 (9th Cir. 2006).

This motion concerns three types of evidence, which plaintiff contends was known to defendants yet withheld from prosecutors and defense counsel: 1) information regarding the existence and terms of a sentencing agreement for Eddie Fink in consideration for his Goldstein testimony; 2) information acquired from sources other than Fink that John McGinest was involved in dealing drugs and that he had a substantial amount of money on him at the time of his murder; and 3)

1   information bearing on the trustworthiness of Loran Campbell's identification

2   testimony, including evidence that he was unable to identify Goldstein without

3   assistance, information supplied by the police inculpating Goldstein, and his post-

4   testimony recollection that he had met Goldstein earlier.

5   **A.   EVIDENCE OF AGREEMENT FOR TESTIMONY IN EXCHANGE FOR

6   LENIENT SENTENCING WAS EXCULPATORY & MATERIAL.**

7   *1.   The Fink Agreement Was Favorable Impeachment Evidence.*

8   Evidence that Fink's testimony was secured in exchange for a promise of

9   favorable sentencing constitutes significant impeachment evidence, which is

10   exculpatory within the meaning of *Brady*. *US v. Blanco*, 392 F.3d 382, 393 (9th

11   Cir. 2004); *Giglio v. United States*, 405 U.S. 150, 154 (1972), (evidence affecting

12   credibility falls within the general rule requiring disclosure). Such agreements

13   suggest that the witness's testimony does not spring from altruistic motives, and in

14   fact, may be accompanied by an interest to testify falsely on precisely those issues

15   most critical to the prosecution's case. *Id*; *Jackson v. Brown,* 513 F.3d 1057, 1078

16   (9th Cir. 2008) (promises of favorable sentencing gave informants strong incentive

17   to lie about exact issue most crucial to the prosecution's case); *Horton v. Mayle*,

18   408 F.3d 570, 578 (9th Cir. 2005) (evidence of immunity deal would have provided

19   powerful and unique impeachment evidence demonstrating that the witness had an

20   interest in fabricating his testimony); *US v. Blanco*, 392 F.3d at 392-393; *Singh v.

21   Prunty*; 142 F.1157 (9th Cir. 1998).

22   Favorable impeachment evidence, therefore, included Stovall's and

23   Collette's letter recommending only a County lid on Fink's grand theft charge. At

24   a minimum, the letter suggested the existence of a deal. Viewed in light of the file

25   note entered by Deputy District Attorney Kenneth Jeffers and the transcript of

26   Fink's 12/5/79 court appearance, it establishes that a deal had been struck. There is

27   no doubt that all information related to possible leniency for Fink had to be

28   disclosed under *Brady*. See *Jackson, supra*, 513 F.3d at 1071 ("no doubt" that a

letter recommending that an informant be allowed to serve his sentence near his family was relevant *Brady* impeachment evidence); *US v. Shaffer*, 789 F.2d 682, 690-691 (9th Cir. 1986), (circumstantial evidence of deal potentially indicated the "'tip of an iceberg' of impeachment evidence subject to disclosure under *Brady*.").

After pleading guilty to grand theft, Fink was sentenced to only 58 days in the Long Beach City jail. This sentence was remarkably lenient, particularly in view of Fink's lengthy criminal record, previous confinement to state prison for theft, and the fact that he was on parole at the time he committed the grand theft offense. Fink achieved this exceedingly favorable outcome just two days after he testified at Goldstein's Preliminary Hearing. Even without direct evidence of a deal, such information qualifies under *Brady*. *See Benn v. Lambert*, 283 F.3d 1040, 1057 (9th Cir. 2002) (inferring deal from the fact that witness was not charged for traffic offense and burglary offenses and that prosecution delayed to file warrant); *US v. Butler*, 567 F.2d 885 (9th Cir. 1978) (inferring deal from assurance to key prosecution witness that "everything would be alright" even in the absence of proof demonstrating definite promises); *Singh*, 142 F.3d at 1162 (inferring deal from benefits received by informant, including prosecution's decline to prosecute charges and recommendation of a reduced sentence).

Not only did evidence of a deal suggest that Fink had a self interest in helping convict Goldstein, it also demonstrated that Fink was willing to, and did, lie under oath. At Goldstein's preliminary hearing, Fink testified that no promises had been made to him.  This was undeniably false since the state had already agreed to offer the County lid contingent upon Fink's assistance in the Goldstein case. Fink perjured himself again at Goldstein's trial, testifying that (1) his bargaining with police in Goldstein's case "did not work at all" and (2) the only thing that police promised they would do for him in exchange for his testimony was to let him do his time in city jail. His testimony was indisputably false.

16

Since Fink lied at both the preliminary hearing and the trial about leniency and his deal, there is no question that this information had to be disclosed by Detective Miller if he was aware of it. It went to the heart of Fink's entire testimony. *Jackson,* 513 F.3d at 1077. As the 9th Circuit has observed, "All the other evidence used by the defense to punch holes in [the informant's] credibility amounted only to circumstantial reasons why [the informant] might alter the truth to continue to feather his own nest. A lie would be direct proof of this concern, eliminating the need for inferences." *See Bernal-Obeso*, 989 F.2d 331, 336 (9th Cir. 1993). *See also Killian*, 282 F.3d 1204, 1209 (9th Cir. 2002), (failure to disclose evidence of perjury deprives the trier of fact from drawing "the fundamental inference that if [a witness] lied about X, Y and Z, it is quite likely that he lied about Q, R and S.").[2]

## 2. *The Fink Agreement Was Material.*

Fink's credibility was of paramount importance to the case and, therefore, any evidence reflecting negatively on his credibility was material. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *US v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" of a different result exists where evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*). The issue is whether, in the absence of the disclosure, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence". *Id.* The court may find a "reasonable probability" even where the remaining evidence would

---

[2] Whether the habeas findings in Mr. Goldstein's case are binding on the court or not, they are instructive. On this issue, Judge Block observed, "Had the perjured testimony been revealed to the jury, the jury would have been presented with direct evidence that Fink repeatedly lied under oath and had a strong incentive to create testimony favorable to prosecution in order to achieve significant personal benefit." Ex. 1074, p.61

1  have been sufficient to convict the defendant. *Strickler v. Greene*, 527 U.S. 263,

2  280 (1999).

3      Impeachment evidence is decidedly material where it could undermine the

4  credibility of a key witness on an essential issue in the case. *Banks v. Dretke*, 540

5  U.S. 668, 699-703 (2004); *Giglio* at 154-155 (1972); *Kyles v. Whitney*, 514 U.S. at

6  444; *Benn v. Lambert*, 283 F.3d at 1054 (holding impeachment evidence material

7  where witness's reliability may well be determinative of guilt or innocence); *Singh*

8  *v. Prunty*, 142 F.3d at 1161 (impeachment evidence of deal between state and

9  witness was material because witness's credibility was vital where witness

10  provided the sole evidence to establish the prosecution's murder for hire theory);

11  *Carriger v. Steward*, 132 F.3d 463, 479 (9th Cir. 1997).

12      Goldstein's alleged jailhouse confession, as recited by Fink, was the nucleus

13  of the prosecution's case. According to Fink, Goldstein confessed that the murder

14  was provoked by a dispute over money. Fink's uncorroborated testimony thus

15  supplied the sole evidence of motive and, indeed, the sole evidence of any

16  connection between Goldstein and the victim whatsoever. Without Fink, the

17  prosecution had no proof that McGinest had ever met Goldstein, much less owed

18  him money. *Benn v. Lambert* , 283 F.3d at 1055 (concluding that evidence of

19  benefits offered in exchange for testimony was material where prosecution had no

20  persuasive theory of motive without informant's testimony).

21      Potentially as important as motive, Fink supplied the particularly damning

22  evidence of a purported admission of guilt. "A confession is like no other evidence.

23  Indeed 'the defendant's own confession is probably the most probative and

24  damaging evidence that can be admitted against him.'" *Arizona v. Fulinante*, 499

25  U.S. 279, 296 (1991). *See also Jackson*, 513 F.3d at 1077 (evidence of benefits

26  promised to informants was material where jailhouse informants were the only

27  witnesses to testify that the defendant had admitted guilt). Finally, Fink's narrative

28  of the fictitious jailhouse confession provided the sole explanation for the missing

murder weapon. The prosecution introduced no other evidence that Goldstein had ever owned a gun, much less fired one.

There was absolutely no physical evidence of any type linking Goldstein to the crime. Despite a full search of Mr. Goldstein's residence, police found no clothes, blood, money or murder weapon. Standing alone, Loran Campbell's eyewitness identification was weak since five eyewitnesses were unable to identify Goldstein, including one who knew Goldstein, and said he was not the person she saw. Without Fink's testimony, the evidence of Goldstein's guilt was remarkably tenuous and lacked a compelling theory, making the withheld information critical exculpatory evidence. *See, e.g., Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005) (promise of immunity to the state's star witness constituted material impeachment evidence; witness's testimony was the "glue that held the prosecution's case together", supplying every key ingredient to the conviction, including plot, motive and confession); *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (undisclosed deal with a witness was material where the witness's testimony regarding the defendant's confession was undoubtedly the centerpiece of the prosecution's case and almost all of the other evidence against the defendant was circumstantial); Ex. 1074, p.40 (Block habeas recommendation) ("full knowledge of any rewards or incentives received by Fink in exchange for his testimony was essential for the jury to reach a valid assessment of the truthfulness and reliability of a witness whose testimony may well have been determinative of petitioner's guilt or innocence. Put another way, the Court further finds that the withheld Fink impeachment evidence was material.") With an understanding that Fink had an incentive to lie, and in fact had demonstrated his willingness to lie under oath, the jury would likely would have distrusted Fink's testimony, and, insofar as it was uncorroborated, fully disregarded it.

**B.    EVIDENCE THAT MCGINEST WAS A DRUG DEALER AND WAS IN POSSESSION OF SUBSTANTIAL MONEY AT THE TIME OF HIS MURDER WAS EXCULPATORY & MATERIAL**

Evidence police acquired independent of Fink regarding McGinest's possession of money or involvement with illegal drugs was material and exculpatory. On or about November 17, 1979, police investigators interviewed Carlton Smith. During the conversation, the police advised Mr. Smith that they knew McGinest was involved in selling illegal drugs, and was in possession of approximately $1,200. Although the evidence does not establish from what source police acquired this information, there can be no question that it was not Edward Fink, who was not interviewed until approximately December 19, 1979.

Evidence regarding McGinest's money, acquired from witnesses other than Fink, could have been used to undercut the prosecution's principal argument supporting Fink's credibility. Throughout the trial, the prosecution emphasized that Fink could only have learned about McGinest's money from Goldstein. However, to the extent that police had pre-existing knowledge of the money, there is at least the possibility that Fink was alerted to the money through his conversations with police, whether by design or inadvertence. Thus, Fink did not have to have learned of money from Mr. Goldstein, as the jury was led to believe.

Evidence concerning McGinest's drug dealing and his money served a second exculpatory function, independent of impeaching Fink. McGinest's involvement in the illegal drug trade suggested an alternative to the prosecution's theory of the case, i.e. of a drug deal gone wrong. Moreover, during the investigation, police acquired no evidence indicating that Goldstein used or sold drugs and, in fact, he did not. Thus, evidence that the murder was drug related tended to exculpate Goldstein because it undermined the prosecution's theory of the case and provided evidence in support of an alternative theory. *See, e.g., D'Ambrosio v. Bagley*, 2006 WL 1169926 (N.D. Ohio 2006) (suppressed witness statements and other evidence were material in part because they could have

20

undercut the state's theory of the case and assisted the defendant in establishing an alternative theory); *Benn v. Lambert*, 283 F.3d at 1055 (undisclosed expert witness conclusion that a fire was accidental was material evidence that could have served to rebut state's primary theory for motive, and the aggravating circumstances of common scheme or plan); *Paradis v. Arave*, 130 F.3d 385 (9th Cir. 1997) (failure to disclose detectives' notes containing medical examiner's conclusion that would have rebutted prosecution's theory of the case was material impeachment evidence where the medical examiner later offered testimony contradictory to the conclusions conveyed to the detective); *Robinson v. Cain*, 501 F.Supp.2d 399, 410 (E.D. La. 2007) (failure to disclose police report referencing anonymous witness statements violated *Brady*, as they suggested a motive not easily imputable to the defendant). Moreover, suppression of evidence related to McGinest's involvement in drug dealing deprived Goldstein's counsel of the opportunity to pursue their own investigation to explore and possibly confirm the alternative theory. *Montgomery v. Bagley*, __ F. 3d __, 2009 WL 3075609 p.6 (6th Cir. 2009) ("failure to disclose exculpatory witness statements not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist causing defense counsel to abandon lines of independent investigation, defenses, or trial strategies that it otherwise might have pursued").

Witness statements that do not conform to the state's theory of the case are also material insofar as they cast doubt on the quality and integrity of police investigation tactics. *Robinson*, 501 F.Supp.2d 399 (had exculpatory witness statements been disclosed, defense counsel could have elicited information from police officers regarding the integrity of the investigation); *Hernandez v. City of El Paso*, 2009 WL 2096272 (W.D. Tex. 2009) (recognizing that disclosure of a witness interview statement contradicting the state's theory would likely have nullified an eyewitness statement, called into question the veracity of other

1  prosecution witnesses, and significantly, served to discredit generally the police

2  methods employed in assembling the case against the defendant).

3      **C.  EVIDENCE IMPEACHING LORAN CAMPBELL'S IDENTIFICATION**

4          **TESTIMONY WAS EXCULPATORY & MATERIAL.**

5          Like the testimony of Edward Fink, the testimony of Loran Campbell

6  was critical to a determination of guilt. Any evidence impeaching his credibility

7  was both favorable and material.

8          *1.  Evidence Impeaching Campbell's ID Was Exculpatory.*

9          Evidence that would have impeached Campbell's identification testimony is

10  exculpatory and therefore favorable within the meaning of *Brady*. *US v. Blanco*,

11  392 F.3d at 393. This evidence included: (1) Campbell's failure to identify the

12  photograph of Goldstein until after a police officer had selected Goldstein's

13  photograph; (2) communication that the police officers were confident that

14  Goldstein was the murderer because he had failed a lie detector test and had taken

15  a post-murder trip to Las Vegas; and (3) the fact that Campbell told the police after

16  testifying at Goldstein's trial that he recalled having met Goldstein before.

17          Campbell's inability to identify Goldstein without assistance from the police

18  grossly undermines the reliability of the purported photo identification and

19  subsequent in court identification and, at the same time, casts serious doubts on the

20  integrity of the entire police investigation. *See Robinson v. Cain*, 501 F.Supp.2d

21  399 (evidence that investigating officers falsely attributed an identification to a

22  witness who did not in fact make the identification tends to impeach the credibility

23  of the officers and the general credibility of their investigation); *Newsome v.*

24  *McCabe*, 265 F.3d 747, 749, 752-53 (coaching two witnesses to select plaintiff

25  photo from a lineup after the witnesses earlier selected pictures from a photo array

26  that did not contain plaintiff's photo would be actionable *Brady* violation under

27  §1983); *Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) (eyewitness'

28  initial statement to police that she would be unable to identify the murderer was

22

favorable evidence under *Brady*). Disclosure of the true circumstances of Campbell's identification would have enabled his defense counsel to seek exclusion on the basis that it was impermissibly suggestive. At the very least, information of the suggestive photo lineup could have been used to impeach the reliability of the identification and the integrity of police investigation tactics.

Campbell's incomplete description of the photo lineup procedure was tantamount to false testimony that had to be disclosed insofar as it left jurors with the impression that Campbell independently identified Goldstein. *E.g., Simms v. Cupp*, 354 F. Supp 698, 700 (D. Oreg. 1972) ("[t]here is no distinction between false testimony and the presentation of a witness' partial testimony which, when considered in isolation, creates a distorted picture of the facts…").

Favorable impeachment evidence also included the fact that officers supplied Campbell with information inculpating Goldstein (e.g., lie detector, money to Las Vegas). Such information would have been highly persuasive that Campbell's identification was not based upon personal observation, but was instead driven by a desire to assist the police in securing the conviction of a guilty person. Similarly, failure to apprise Goldstein's trial counsel of his statement that he had met Goldstein before would have raised the inference that Campbell recognized Goldstein from that earlier encounter, not the night of the murder.

2.    *Evidence Impeaching Campbell's ID Was Material.*

Any evidence impeaching Campbell's identification might well have altered the outcome of the trial and was therefore material. *Kyles v. Whitney*, 514 U.S. at 419 (noting that the effective impeachment of one eyewitness can call for a new trial even though the attack can extend to others); *Hernandez v. City of El Paso*, 2009 WL 2096272, *supra*, at p. 18 (undisclosed witness statement undermining eyewitness account was material because the case turned almost exclusively on eyewitness identification and lacked physical evidence linking defendant to the

victim's murder); *Montgomery v. Bagley*, 2009 WL 3075609 (6th Cir. 2009).[3].
Eyewitness identification testimony greatly influences juries. *See, e.g., Watkins v. Sowders*, 449 U.S. 341, 350, 101 S.Ct. 654, 660 (U.S. 1981) (Brennan, J., dissenting) (citing Elizabeth Loftus, <u>Eyewitness Identification</u>, for the proposition that eyewitness identification is "overwhelmingly influential", as "there is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' ") (original emphasis); *United States v. Brownlee*, 454 F. 3d 131 (3d Cir. 2006) (citing dissent).

In Goldstein's case, Campbell's identification was of especially pivotal importance. Of six eyewitnesses, Campbell was the only one who identified Goldstein as the murderer. One of the five unable to identify Goldstein knew Goldstein and expressly rejected the possibility that he was the assailant (whose face she could well observe). In addition, whereas four witnesses described the murderer as African-American or Mexican, only Campbell and one other witness described the murder as Caucasian. *See Silva v. Woodford*, 279 F.3d 825, 854-55 (9th Cir. 2002) (evidentiary hearing was warranted on a *Brady* claim warranted; "credibility was a critical issue, given that he was the only witness who could identify [defendant] as the triggerman").

The consequences of impeaching Campbell's identification would have reverberated throughout the case. Without the corroboration supplied by Campbell's positive identification, Fink's testimony would not likely have carried a guilty verdict, especially given the lack of physical evidence linking Goldstein to the crime. See *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (noting that "the destruction by cross-examination of the credibility of one of two crucial

---

[3] As discussed previously, federal courts widely recognize that impeachment evidence is material where it could undermine the credibility of a key witness on an essential issue in the case. *Banks v. Dretke*, 540 U.S. 668, 699-703 (2004), *Giglio*, 405 U.S. 150 at 155 (1972), *Kyles v. Whitney*, 514 U.S. at 444; *Benn v. Lambert*, 283 F.3d at 1054; *Singh v. Prunty*, 142 F.3d at 1161; *Carriger v. Steward*, 132 F.3d 463, 479 (9th Cir. 1997)

witnesses-even if the other remains untouched-may have consequences for the case extending far beyond the discrediting of his own testimony"); Ex. 1074, p.49 (Block habeas recommendation) ("the credibility of Fink's testimony would have been seriously eroded without the corroboration supplied by Campbell's strong and positive identification"; thus, "the withheld Campbell impeachment evidence was material")**.**

## IV.    CONCLUSION

For the reasons stated above, the motion should be granted.

DATED: October 26, 2009          Respectfully Submitted,

LITT, ESTUAR, HARRISON & KITSON LLP
KAYE, MACLANE & BEDNARSKI LLP

By:__/s/ Barrett S. Litt_____
 Barrett S. Litt
 Attorneys for Plaintiff

25