Barrett S. Litt, SBN 45527
E-Mail: blitt@littlaw.com
LITT, ESTUAR, HARRISON & KITSON, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114
Facsimile:  (213) 380-4585

Ronald O. Kaye, SBN 145051
David McLane, SBN 124952
Marilyn E. Bednarski, SBN 105322
Email: rok_kmb@earthlink.net
KAYE, McLANE & BEDNARSKI LLP
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiff Thomas Goldstein

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS GOLDSTEIN,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LONG BEACH, et al.,<br><br>Defendants. | CASE NO CV 04-9692 AHM (E)<br><br>PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT FOR THE CITY OF LONG BEACH'S FAILURE TO MAINTAIN A SYSTEM ENSURING THAT PROSECUTORS WERE AWARE OF INFORMANT BENEFIT AND OTHER EXCULPATORY INFORMANT INFORMATION. [FILED CONCURRENTLY WITH SEPARATE STATEMENT OF UNDISPUTED FACTS; EXHIBITS]<br><br>Hearing Date:   November 16, 2009<br>Hearing Time:   10:00 A.M.<br>Courtroom:       14<br>Trial Date:        April 13, 2010 |

**TABLE OF CONTENTS**

I.      INTRODUCTION ……………………………………………………1

II.     STATEMENT OF FACTS……………………………………..……2
    A.  Edward Floyd Fink, The Informant Who Testified Against Mr.
        Goldstein, Received Benefits For His Testimony At The
        Goldstein Trial……………………………………………..……… 2
    B.  The Benefits Received By Fink Were Not Disclosed To The
        Prosecutors On The Goldstein Case And, Thus, Could Not Be
        Disclosed To Mr. Goldstein…………………………………..……4
    C.  In 1979-1980, The Long Beach Police Department ("LBPD")
        Had No System To Track Or Provide Case Prosecutors Informant
        Benefit Information……………………………………………..…… 7
        1.  LBPD Had No Policies Governing the Use of Informants……..…7
        2.  LBPD Had No Training Reflecting the Use of Jailhouse
             Informants in Police Investigations………………………………… 8
        3.  LBPD Had No System in Place to Research Jailhouse Informants'
             Background (Including Benefits Previously Offered to Jailhouse
             Informants)……………………………………………………… 8
        4.  LBPD Had No Policy to Ensure Information About Benefits
           Offered to Informants Was Turned Over to the Prosecutor Handling
           The Case In Which An Informant Was To Testify……………….. 10

III.   ARGUMENT ……………………………………………………...10
    A.  Summary Judgment Standards…………………………………….. 10
    B.  The Long Beach Police Department Had A Constitutional Duty To
        Track Benefits And Agreements For Leniency Given To Informants
        For The Purpose Of Ensuring That This Information Could Be
        Disclosed To Criminal Defendants…………………………………... 11
    C.  The Long Beach Police Department Failed To Meet Its Brady
        Obligations For A Proper System Notifying Prosecutors of Informant
        Brady Information…………………………………………… 14

IV.  CONCLUSION…………………………………………………... 20

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986).............................................................................10

*Anderson v. Liberty Lobby, Inc.*
 477 U.S. at 248................................................................................11

*Aydin Corp. v. Loral Corp.*
718 F.2d 897 (9th Cir. 1983) .............................................................11

*Barbee v. Warden*
331 F.2d 842 (4th Cir.1964) ...............................................................13

*Board of County Comm'rs of Bryan County v. Brown*
520 U.S. 397 (1994)............................................................................15

*Brady v. Maryland*
373 U.S. 83 (1963)......................................................................1, 2, 12

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ...........................................................................11

*Gibson v. County of Washoe,*
290 F.3d 1175 (9th Cir. 2002) .......................................................2, 15

*Giglio v. United States,*
405 U.S. 150 (1972)................................................................. 1, 11, 18

*Grandstaff v. City of Borger, Texas, et al.*
767 F.2d 161 (5th Cir. 1985) ................................................................2

*Jackson v. Brown*
513 F.3d 1057 (9th Cir 2008) ......................................... 1, 12, 13, 18

*Kyles v. Whitley*
514 U.S. 419 (1995)............................................................................12

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*
475 U.S. 574 (1987) ...........................................................................10

*Moldowan v. City of Warren*
578 F.3d 351 (6th Cir. 2009) ...........................................................14

*Napue v. Illinois*
360 U.S. 264 (1959) ...........................................................................12

*Owen v. City of Independence*
445 U.S. 622 (1980) .............................................................................1

*Pyle v. Kansas*
317 U.S. 213 (1942) ...........................................................................13

*Strickler v. Greene*
527 U.S. 263 (1999) .............................................................................2

*Tennison v. City & County of San Francisco*
570 F.3d 1078 (9th Cir. 2009) .........................................................14

*U.S. v. Bin Laden*
397 F. Supp. 2d 465 (S.D.N.Y. 2005) ..............................................12

*United States v. Bloom*
112 F.3d 200 (5th Cir. 1997) ...........................................................10

*United States v. Butler*
567 F.2d 885 (9th Cir.1978) .............................................................13

**STATE CASES**

*In re Jackson,*
3 Cal. 4th 578 (1992) ........................................................................12

iii

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

In this Motion, Plaintiff Thomas Lee Goldstein moves the Court for partial summary judgment against Defendant City of Long Beach based on 1) its police department's failure to train police in *Brady v. Maryland* in general and in its application to jailhouse informants in particular, and 2) its failure to maintain a system for tracking informant benefits. Each of these failures resulted in the suppression of evidence favorable to Mr. Goldstein – *i.e.*, that jailhouse informant Edward Floyd Fink received leniency in sentencing in exchange for testifying against Mr. Goldstein, and assistance from the Long Beach Police Department in doing so. Long Beach's failure to maintain such a system was the moving force behind the deprivation of Mr. Goldstein's rights.

There is no material dispute regarding these facts and, based on these facts, the City of Long Beach violated Mr. Goldstein's Fourteenth Amendment due process rights as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). For this reason, Mr. Goldstein in entitled to judgment as a matter of law against the City of Long Beach.

The following fairly summarizes the undisputed facts, as we elaborate below:

1.     There was a formal agreement that Informant Edward Fink would receive benefits for testifying against Mr. Goldstein.

2.     The Goldstein trial prosecutor was not aware of the agreement.

3.     The informant, Edward Fink, falsely denied that there was an agreement.

4.     The Long Beach Police Department failed to maintain any system, policy or training regarding the tracking of informant benefits to ensure the disclosure of this type of information to the prosecutor using an informant as a witness.

1

5.     As addressed in Plaintiff's simultaneously filed companion motion for partial summary judgment to determine that certain items of information were exculpatory and material, this failure to disclose the benefits received by informant Fink was material, *i.e.,* evidence of such benefits had a "reasonable probability" of affecting the outcome of Mr. Goldstein's trial. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady v. Maryland*, 373 U.S. 83 (1963).

**6.**     Had the Long Beach Police Department had a system in place ensuring that informant benefit information reached the prosecutor handling the case in which the informant was to testify, and that its officers were properly trained, the information would have been turned over to the defense.

This Motion is based upon the Memorandum of Points and Authorities, declarations, exhibits, the Statement of Uncontroverted Facts, the Court's file in this matter, and upon such other and further matters as may properly come before the Court.

Plaintiffs have complied with Local Rule 7-3 by meeting and conferring in the presence of the Court to set a briefing schedule for cross-summary judgment motions, which has since been modified to the present schedule.

## II. STATEMENT OF FACTS

### A. EDWARD FLOYD FINK, THE INFORMANT WHO TESTIFIED AGAINST MR. GOLDSTEIN, RECEIVED BENEFITS FOR HIS TESTIMONY AT THE GOLDSTEIN TRIAL.

On November 19th and 20th, 1979, Informant Edward Fink met with Defendants Collette and Wren at the Long Beach Police Department where Fink provided a statement that Mr. Goldstein had admitted to the murder of John

2

McGinest. Ex. 1520[1], pp.350:21-27 (trial transcript); Ex. 1514, pp.39-40 (Collette report of Fink interview).

On December 5, 1979, Edward Fink waived preliminary hearing, and the matter was set over to December 19, 1979. At that time, it was anticipated that Fink would plead guilty to the charge pending against him, with a DA recommendation of a County Lid (i.e., a sentence not to exceed one year in the County Jail). The County Lid recommendation was conditioned upon Fink's cooperation in a manner that was implied but not explicit. This is reflected in the following statement made to Fink, on the record, by Deputy District Attorney Kenneth Jeffers, the prosecutor in *People v. Fink*, A020750:

> "You [Fink] understand, don't you, that we, or our office, would be able to approach the Judge at sometime and tell him that things haven't worked out quite the way we thought and we don't think the Judge can go along with the County lid offer, if you know what I mean?"
> Ex. 1035, pp. 7-8.

On the same date (December 5, 1979), Deputy DA Jeffers entered a note into the DA's file in *People v. Fink* that memorialized the agreement with Fink, and the fact that one of the Goldstein detectives, Defendant William Collette, would obtain a letter from his captain regarding the County Lid agreement. The note reads,

> "The defendant waived his right to a prelim & we certified the case to Dept. J for 12-19-79. The defendant then will p/g [plead guilty] with an offer from us of a co-lid [County lid]. This was promised on the record. Investigator Collette will furnish us a letter from his capt re co-lid."
> Ex. 1028.

On December 13, 1979, Deputy Chief W.F. Stovall of the Long Beach

---

[1] For ease of reference, combined exhibits will be submitted for both the *Brady* MSJ and the *Monell* MSJ. The exhibits will be in numerical order attached to a declaration of Barrett Litt.

Police Department signed a letter addressed to Ronald Ross, Head Deputy of the Long Beach Office of the Los Angeles County District Attorney's Office, with regard to a County Lid recommendation for Fink. Although the letter is signed by Chief Stovall, it was written by William Collette, whose initials appear at the bottom left where the initials of the author typically appear.  That letter states:

> "Homicide Investigators W.B. Collette and Logan Wren indicate that Edward Fink is to be used as a witness in an upcoming homicide case wherein he obtained admissions from the alleged suspect.  It is suggested that a County sentence would be appropriate in this case."
> Ex. 1026.

**B.**  **THE BENEFITS RECEIVED BY FINK WERE NOT DISCLOSED TO THE PROSECUTORS ON THE GOLDSTEIN CASE AND, THUS, COULD NOT BE DISCLOSED TO MR. GOLDSTEIN**

On December 17, 2009, at the preliminary hearing of Mr. Goldstein, Fink testified that he had no expectation of a benefit for his testimony in the case. Specifically, the following exchange occurred during the cross-examination of Fink:

> "Q.  ANY PROMISES MADE TO YOU AT ALL, SIR,
> IN REFERENCE TO PROVIDING THIS
> INFORMATION?
> "A.  NO
> "Q. YOU DON'T EXPECT TO GET ANYTHING
> FROM THIS, DO YOU, SIR?
> "A. I DON'T KNOW.
> "Q. WHAT DO YOU MEAN YOU DON'T KNOW?
> "A. I DON'T KNOW.
> "Q. ARE YOU EXPECTING TO GET A BREAK ON
> YOUR CASE?
> "A. I DON'T KNOW.

4

"Q. HAS A BREAK BEEN PROMISED YOU?

"A. I HAVEN'T GOT A BREAK YET."

Ex. 1522, pp.63:24—64:9 (Transcript of Goldstein Preliminary

Hearing).

On December 17, 1979, Edward Fink entered a guilty plea in Case No. A020750, and received 58 days, with credit for time served. Ex. 1043.

The Deputy DA, Kurt Seifert, prosecutor in the preliminary hearing – prior to Fink's sentencing two days later– testified that he was unaware of an agreement that Fink was to receive benefits in exchange for his Goldstein cooperation.

Q.    So therefore Mr. Seifert, is it fair to say that you did

not believe that when Mr. Fink said that no promises had

been made to him, that you were -- you believed he was

testifying truthfully, correct?

A.    Yes, because if I thought he had been given a

benefit for his testimony, I would have brought it to the

attention of the court by virtue of at least taking him as a

hostile witness and asking him, "Isn't it true that you

were given a free pass on a drug case to do this" or "Isn't

it true that they promised your mommy a trip to Florida,"

you know, whatever it may or may not have been, but I

certainly would have brought it to the attention of the

court if I knew of such a thing.

Ex. 1745, pp.34:16--35:3 (Kurt Seifert D. Tr.)

Q.    Just to keep the record clear:  Based on the fact that

there's no objection to this or a cross examination of Mr.

Fink as a hostile witness, you accepted as true Mr. Fink's

testimony that he received no promises?

A.    I would say so, yes.

5

1

2          *Id.,* pp.35:20-25.

3          As he did at the Goldstein preliminary hearing, at trial Fink denied that he

4   was in the practice of bargaining with the police with information, and stated that

5   when he did bargain, "it never worked." Ex. 1520, p.608:24-27. When defense

6   counsel asked Fink whether it worked this time, he testified that it didn't work at

7   all. *Id.*, pp.608:28--609:3. Contrary to the agreement with Mr. Jeffers on December

8   5, 1979, and the "County Lid" sentence he received on December 19, 1979 (which

9   resulted in an actual sentence of 58 days), Mr. Fink falsely denied receiving a

10  benefit for his testimony, other. He further falsely stated that the only benefit the

11  the Long Beach Police Department promised him was that he would be able to

12  serve his time in Long Beach City Jail. *Id.*, p.618:2-6

13         The Deputy District Attorney who represented the prosecution at Mr.

14  Goldstein's trial was John Timothy Browne.  Mr. Browne testified at his

15  deposition that he was unaware, before or during trial, that Edward Fink was

16  receiving benefits for this testimony. Ex. 1744, pp. 54:17--55:1 (John Timothy

17  Browne D. Tr.).  Further, prior to the trial, no officer from the Long Beach Police

18  Department advised Mr. Browne that Fink was receiving benefits for his

19  testimony. *Id.*, pp.58:23-59:10. Had Mr. Browne known of the benefits provided to

20  Fink, he would have provided that information to the defense. *Id.*, pp.55:12--56:10.

21  He did not learn that Fink testified falsely at any time before the Goldstein habeas

22  proceedings. *Id.*, p.56:11-21. [2]

23         Because of the failure to disclose these benefits, and the promise of benefits

24  to the prosecution, Lorenzo Pereyda, Mr. Goldstein's defense counsel, was unable

25  to effectively cross-examine Fink and challenge his credibility.  At the evidentiary

26  hearing for Mr. Goldstein's habeas proceeding, Mr. Pereyda testified that he had

27
28  _____

[2] Defendant Collette claims that he provided to prosecutor Kurt Seifert, a copy of
the Long Beach Police Department letter recommending a County Lid for Fink.
See Ex. 1704, pp.178:2--180:14 (Collette D. Tr.). However, he never testified that
he advised him that, in fact, a deal had been struck.

never received a copy of the letter marked as Exhibit 1026 (from William Stovall to Ron Ross), and that he would have used such a letter to impeach Mr. Fink if he had been aware of it. Ex. 1074, p.20 (Report and Recommendation of Magistrate Judge); Ex. 1406, pp.23--27 (Pereyda testimony at habeas evidentiary hearing).

### C.   IN 1979-1980, THE LONG BEACH POLICE DEPARTMENT ("LBPD") HAD NO SYSTEM TO TRACK OR PROVIDE CASE PROSECUTORS INFORMANT BENEFIT INFORMATION.

*1.    LBPD Had No Policies Governing the Use of Informants.*

Between 1979 and 1980, the Long Beach Police Department (LBPD) Criminal Investigations Division (CID) had no policies governing the use of jailhouse informants in criminal investigations. Ex. 1704, pp.135:17--136-15 (Collette D. Tr.); Ex. 1711, pp.49:10--50:5 (MacLyman D. Tr.);  Ex. 1708, p.162:11-17 (Wren D. Tr.); Ex. 1734, pp.55:20--56:2 (Kartinen D. Tr.); Ex. 1735, p.84:7-12 (Robbins D. Tr.).  For example, the LBPD CID had no established or clear policy regarding proper documentation of interactions with jailhouse informants. Ex. 1734, p.60:16-19 (Kartinen D. Tr.). To the extent there was a possibility that LBPD had implemented policies governing the use of jailhouse informants, these policies were not known to police personnel. Ex. 1704, pp.135:17--136-15 (Collette D. Tr.); Ex. 1734, pp.55:20--56:2 (Kartinen D. Tr.); Ex. 1711, pp.49:10--50:5 (MacLyman D. Tr.); Ex. 1712, p.56:1-10[3] (Stovall D. Tr.); Ex. 1708, p.162:11-17 (Wren D. Tr.).

To the extent any policies concerning jailhouse informants were proposed or implemented at CID during William Stovall's tenure as Deputy Chief, those policies should have been submitted to Stovall for review. Ex. 1712, pp.56:1--57:10 (Stovall D. Tr.).  William Stovall does not recall reviewing any policies concerning the use of informants in criminal investigations during his tenure as Deputy Chief. Ex. 1712, p.57:11-18 (Stovall D. Tr.).

### 2.    *LBPD Had No Training Reflecting the Use of Jailhouse Informants in Police Investigations.*

Between 1979 and 1980, LBPD police personnel were not trained on any specific issues regarding the use of jailhouse informants in criminal investigations. Ex. 1704, pp.145:10--146:1 (Collette D. Tr.); 1045:23-1046:7; Ex. 1734, p.59:1-9 (Kartinen D. Tr.);  Ex. 1711, p.50:6-12 (MacLyman D. Tr.); Ex. 1700, pp.46:16--47:13, 56:9-14 (Miller D. Tr.); Ex. 1708, pp.166:13--167:13 (Wren D. Tr.). Specifically, LBPD police officers were not trained on: (1) methods to assess the reliability of information supplied by jailhouse informants. Ex. 1711, pp.60:22--61:1 (MacLyman D. Tr.); or (2) procedures to track benefits provided to jailhouse informants in exchange for their testimony on criminal matters. *Id.* p.50:13-25; Ex. 1700, pp.206:21-207:2 (Miller D. Tr.); Ex. 1735, p.79:11-18 (Robbins D. Tr.).

As a matter of practice, LBPD detectives did not differentiate between jailhouse informants and other types of witnesses for the purpose of criminal investigations.  Ex. 1708, p.167:15-25 (Wren D. Tr.). LBPD detectives did, however, differentiate between "confidential informants," whose identity was kept secret, and other classifications of witnesses. Ex. 1704, p.137:5-8 (Collette D. Tr.); Ex. 1711, p.115:16-18 (MacLyman D. Tr.); Ex. 1708, p.165:13-21 (Wren D. Tr.).

### 3.    *LBPD Had No System in Place to Research Jailhouse Informants' Background (Including Benefits Previously Offered to Jailhouse Informants).*

Between 1979 and 1980, LBPD had no policy requiring detectives to research the background of an informant to be used as a witness in a criminal case. Ex. 1711, p.73:1-4 (MacLyman D. Tr.);.  This included: (1) no system or procedure detectives could access to research background information on jailhouse informants, including the informant's previous involvement in criminal investigations. Ex. 1731, pp.53:10--54:1 (Paul Chastain D. Tr.); Ex. 1711,

---

[3] Between 1976 and 1983, William Stovall was the Deputy Chief of the Criminal Investigations Bureau (CIB) of the LBPD. Ex. 1712, p.16:9-14 (Stovall D. Tr.)

pp.71:20-72:10 (MacLyman D. Tr.); and (2) no system or procedure that detectives could use to research benefits offered to or received by jailhouse informants who assisted in past criminal investigations. Ex. 1731, p.57:1-12 (Chastain D. Tr.); Ex. 1734, p.56:8-12 (Kartinen D. Tr.); Ex. 1700, p.211:2-7 (Miller D. Tr.); Ex. 1712, pp.131:2--132:2 (Stovall D. Tr.).

Correspondingly, LBPD detectives did not record information about jailhouse informants in any location outside of a case file for a particular case, or an interview report contained in a case file. Ex. 1708, p.180:1-20 (Wren D. Tr.). Thus, LBPD did not maintain "informant files" with information on benefits offered to, or received by, jailhouse informants who assisted in criminal investigations. Ex. 1704, pp.136:17--137:8, 142:21-25 (Collette D. Tr.); Ex. 1735, p.80:11-15 (Robbins D. Tr.); Ex. 1708, pp.165:24--166:11 (Wren D. Tr.), and if there were any such "informant files," LBPD detectives were unaware of any location in the department where they were kept. Ex. 1734, p.56:20-24 (Kartinen D. Tr.).

Similarly, LBPD detectives were unaware of any database or other resources containing information about benefits previously offered to informants in exchange for providing information in a criminal case. Ex. 1734, p.58:10-20 (Kartinen D. Tr.); Ex. 1735, pp.59:24--61:1, 61:12-19 (Robbins D. Tr.).  There were no resources to research whether jailhouse informants had previously received benefits in exchange for testimony, except consulting other detectives. Ex. 1734, pp.56:25-57:5 (Kartinen D. Tr.); Ex. 1735, pp.59:24--61:1, 61:12-19 (Robbins D. Tr.).  However, consulting other detectives for information regarding a jailhouse informant's past activity was not a routine practice among CID personnel in 1970 and 1980. Ex. 1734, p.73:5-22 (MacLyman D. Tr.); Ex. 1712, pp.59:22-60:2 (Stovall D. Tr.).

1

2

3
              4.     *LBPD Had No Policy to Ensure Information About Benefits Offered to Informants Was Turned Over to the Prosecutor Handling The Case In Which An Informant Was To Testify.*

4

In 1979 and 1980, LBPD had no established or clear policy ensuring that

5

information regarding benefits offered to, or received by, jailhouse informants was

6

provided to the prosecutor(s) in the case in which the informant was to testify.

7

*William Stovall Depo.*, Ex. 1712, pp.135:6-138:10 (Stovall D. Tr.); Ex. 1734,

8

p.65:11-24 (Kartinen D.Tr.).  LBPD detectives were not trained: (1) that benefits

9

promised to, or received by, jailhouse informants constituted information that must

10

be disclosed to the DA pursuant to *Brady v. Maryland*. Ex. 1700, pp.82:22--83:14;

11

84:4-10; 86:13-17 (Miller D. Tr.); (2) to disclose benefits promised to or received

12

by jailhouse informants to the District Attorney responsible for the case in which

13

the informant was to testify. Ex. 1734, pp.64:19--65:10; 67:2-11 (Kartinen D. Tr.);

14

(3) nor were they advised that it was their responsibility to learn of any deals or

15

arrangements with a jailhouse informant assisting in a criminal investigation. Ex.

16

1700, pp.81:10--82:5 (Miller D. Tr.).  In fact, detectives working for LBPD did not

17

routinely disclose information regarding benefits offered to, or received by,

18

informants in exchange for testimony on a particular case. Ex. 1731, p.59:1-20

19

(Chastain D. Tr.).[4]

20
**III.   ARGUMENT**

21
    **A.   SUMMARY JUDGMENT STANDARDS**

22

Summary judgment must be granted where there is no issue as to any

23

material fact and the moving party is entitled to judgment as a matter of law.

24

Federal Rule of Civil Procedure 56(c);  *Matsushita Electric Indus. Co. v. Zenith*

25

*Radio Corp.*, 475 U.S. 574, 586-587 (1987). A fact is material if it might affect the

26

outcome of the suit under the governing substantive law. *Anderson v. Liberty*

27

*Lobby, Inc.,* 477 US 242, 248 (1986); *United States v. Bloom,* 112 F3d 200, 205

28

1   (5th Cir. 1997). A factual dispute is "genuine" where "the evidence is such that a

2   reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

3   *Liberty Lobby, Inc.*, *supra*, 477 US at 248.

4          The opposition evidence must be such that it could cause reasonable persons

5   to disagree on whether the facts claimed by the moving party are true ... "enough to

6   require a jury or judge to resolve the parties' differing versions of the truth." *Aydin*

7   *Corp. v. Loral Corp.,* 718 F2d 897, 902 (9th Cir. 1983). If the opposition evidence

8   is merely "colorable" or "not-significantly probative," summary judgment may be

9   granted. *Anderson v. Liberty Lobby, Inc., supra*, 477 US at 249–250. In a case such

10  as this, where a critical issue is the absence of evidence, the moving party may

11  point to such absence and is not responsible to affirmatively disprove the

12  opponent's case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) )("we find

13  no express or implied requirement in Rule 56 that the moving party support its

14  motion with affidavits or other similar materials *negating* the opponent's claim)

15  (original emphasis); *California Architectural Bldg. Products, Inc. v. Franciscan*

16  *Ceramics, Inc.* 818 F2d 1466, 1468 (9th Cir. 1987).

17      **B.   THE LONG BEACH POLICE DEPARTMENT HAD A CONSTITUTIONAL**
18           **DUTY TO TRACK BENEFITS AND AGREEMENTS FOR LENIENCY**
19           **GIVEN TO INFORMANTS FOR THE PURPOSE OF ENSURING THAT**
             **THIS INFORMATION COULD BE DISCLOSED TO CRIMINAL**
20           **DEFENDANTS**

21         Eight years before Mr. Goldstein's conviction, the United States Supreme

22  Court held that an accused's due process rights were violated when a prosecutor

23  fails to disclose benefits given by law enforcement to an informant in exchange for

24  testimony, despite the prosecutor not being personally aware of the existence of

25  these benefits.  *Giglio v. United States*, 405 U.S. 150, 155 (1972). Thus *Giglio*

26  mandated that prosecutors, where necessary to ensure compliance with their

27

28  ───────────────────────
    [4] To provide a flavor of defendants' training and understanding of *Brady*, we
    summarize some of Defendant Miller's testimony on these issues at Section III (C).

                                    11

1  obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*,

2  373 U.S. 83 (1963), needed to establish "procedures and regulations . . . to insure

3  communication of relevant information [pertaining to the benefits received by

4  informants]" to prosecutors handling cases so that they could in turn provide it to

5  the defense. *Id.* at 154.

6      In *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), the Supreme Court made it

7  clear that *Giglio* duties extend to "evidence known only to police investigators and

8  not to the prosecutor." The Court acknowledged that "police investigators

9  sometimes fail to inform a prosecutor of all they know," but, citing *Giglio*, brushed

10  aside the suggestion that such a police failure would excuse a *Brady* violation.

11      As the Ninth Circuit has explained, "*Giglio's* focus on the responsibility of

12  the prosecutor to investigate all promises made on behalf of the government

13  extends to promises made by the police, who also make any such promises as

14  spokespersons for the government, and for whom the prosecutor bears

15  responsibility." *Jackson v. Brown*, 513 F.3d 1057, 1073 (9th Cir 2008); *see also*

16  *U.S. v. Bin Laden,* 397 F.Supp.2d 465, 481 (S.D.N.Y. 2005) (U.S. Marshals

17  Service considered "part of the prosecution team" for *Giglio* and *Brady* purposes

18  with respect to their recording of teleconferences with witness).

19      Notably *Jackson v. Brown, supra,* involved the non-disclosure of evidence

20  of benefits by the very same officers who are defendants here. In the 1978 Earl

21  Lloyd Jackson murder case, which resulted in conviction and a death sentence ,

22  jailhouse informant Mark Mikles testified falsely about sentencing benefits he

23  received in exchange for his testimony. Defendants Collette and Wren were the

24  LBPD homicide detectives who worked on the Jackson case. Ex. 1704, pp. 415:12-

25  -418:18 (Wren D. Tr.) Defendant Collette testified for Mr. Mikles at his sentencing

26  hearing. *In re Jackson*, 3 Cal.4th 578, 648 (1992). Defendants Wren and Collette

27  were aware of the sentencing benefits Mikles received. Ex. 1260, pp.70:23--72:18

28  (Mikles testimony in Gordon habeas proceeding). Indeed, Deputy Chief Stovall of

12

the LBPD wrote a letter to the District Attorney setting forth Mikles' (whose name is misspelled) cooperation with police, including that "he is currently on call to testify in a Long Beach homicide which Detectives Collette and Wren are working." Ex. 1024. (Stovall letter re Mikles). This letter was sent on November 20, 1978, shortly before Mikles testified in Jackson, to which the last quoted sentence is an obvious reference. Mikles testified around the end of December 1978, according to Justice Mosk's dissent in *In re Jackson.*

The Ninth Circuit found that the failure to disclose these benefits constituted a *Giglio* violation. 513 F.3d at 1073. Based on *Kyles, supra,* the Circuit concluded "that failing to hold the State 'accountable ... for evidence known only to police investigators and not to the prosecutor ... would ... amount to a serious change of course from the *Brady* line of cases.' " The "principle underlying this unexceptional holding dates back, at the latest, to the Supreme Court's decision in *Giglio." Id.* Thus, the fact that the police are responsible to provide *Brady* material to the prosecution dates back at least to *Giglio.* Similarly, *Giglio* makes clear that, where it is necessary to ensure Brady compliance, the state's responsibility extends to the creation of "procedures and regulations… to insure communication of relevant information" to the prosecutor.

The *Jackson* Court elaborated on the independent duty of the police, as part of the government, to ensure *Brady* compliance. The Court noted that, "[s]ince the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure." The Court quoted *United States v. Butler,* 567 F.2d 885, 891 (9th Cir.1978) (citing *Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir.1964) (citing *Pyle v. Kansas,* 317 U.S. 213 (1942)). The Court noted that, in 1979, the Fifth Circuit noted that "investigative officers are part of the prosecution [under] *Butler*, *Freeman v. Georgia,* 599 F.2d 65, 69-70 (5th Cir.1979), and that the Ninth Circuit reiterated that position in *United States v. Steel,* 759 F.2d 706 (9th Cir.1985). Finally, the *Jackson* Court

13

noted that the State of Louisiana conceded at oral argument in *Kyles* that it was " 'held to a disclosure standard based on what all State officers at the time knew.' " 514 U.S. at 438 n. 11.

This line of cases makes clear that there are responsibilities that run to both the prosecutor and the police. Certainly, it is the "responsibility of the prosecutor " to investigate promises made by the police. *Kyles, supra*. However, this does not mean that the prosecutor's office bears exclusive constitutional responsibility to ensure that the *Giglio* and *Brady* obligations are met. To the contrary, it is well-established that the police have a *Brady* duty to ensure that exculpatory evidence is disclosed to the prosecutor's officer. See cases cited above; *see also, e.g., Moldowan v. City of Warren,* 578 F.3d 351, 381 (6th Cir. 2009); *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009) (both cases establishing the principle in the context of §1983 actions for *Brady* violations).[5] As the Sixth Circuit has said,

> "Although the prosecutor's office bears primary responsibility for carrying out the state's actual 'disclosure' obligations under Brady, the police bear . . . an equally important 'Brady-derived' responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan*, 578 F.3d at 381.

C.   **THE LONG BEACH POLICE DEPARTMENT FAILED TO MEET ITS BRADY OBLIGATIONS FOR A PROPER SYSTEM NOTIFYING PROSECUTORS OF INFORMANT BRADY INFORMATION.**

This motion poses the simple question (although not one directly litigated previously) of whether the obligation to have procedures and regulations to ensure *Brady* compliance is not only that of the prosecution, but also that of the police.

There is no doubt, certainly under the Ninth Circuit law discussed above,

---

[5] In *Moldowan*, 578 F.3d at 381, the Court noted that virtually every other circuit has concluded either that the police share in the state's obligations under *Brady,* or that the Constitution imposes on the police obligations analogous to those recognized in *Brady*, citing cases from the 1st, 5th, 11th and 7th Circuits.

14

that the police have an independent obligation under *Brady* to provide the prosecutor exculpatory information. There is similarly no doubt that the Goldstein prosecutors were unaware of any deal for Mr. Fink's testimony. See Statement of Facts.

*Monell* entity liability exists if a municipality violated one's rights and acted with " 'the state of mind required to prove the underlying violation,' just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Gibson v. County of Washoe,* 290 F.3d 1175, 1185 (9th Cir. 2002) (quoting *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 405 (1994)). The state of mind required for a *Brady* violation in a §1983 case under Ninth Circuit standards is that law enforcement acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009).

*Monell* entity liability also exists if a "municipality's deliberate indifference led to" the "omission [of taking necessary actions] and that the omission caused the employee to commit the constitutional violation." *Gibson v. County of Washoe,* 290 F.3d 1175, 1185 (9th Cir. 2002). To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation. *Id*. (citing *Farmer v. Brennan,* 511 U.S. 825, 841 (1994)).

The deliberate indifference standard – which is the one advanced in this motion – may be demonstrated without having to show a pattern of constitutional violations. *See Board of the County Commissioners v. Brown,* 520 U.S. 397, 409 (1997). In *Brown*, the Court observed:

> "In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a

failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right."

That is precisely the situation presented here. The need for a system ensuring delivery of *Brady* information to the prosecutor handling the case was obvious when viewed in the context of a very large County-wide prosecutorial system, in which the District Attorney's Office works with a wide range of police departments, and where district attorneys are constantly moved around. The likelihood of a recurring situation in which *Brady* failures would occur existed. Officers were obviously not trained in the importance of ensuring that *Brady* information reached the proper prosecutor. This is an example of a situation where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Every investigation carried with it the obligation to comply with *Brady*. Thus, the City was, and had to be, fully aware that officers would constantly confront *Brady* issues, and a failure to properly handle those issues would result in constitutional violations.

The officers' testimony revealed only the most cursory training regarding *Brady* issues. Indeed Defendant Miller did not purport to know what constituted *Brady* material. He simply relied on the generalized notion that he was supposed to give "everything" to the District Attorney. For example:

> ➤ Ex. 1700, pp. 82:9--83:14 (Miller "never heard" that *Brady* would apply to a deal provided to an informant);

> ➤ *Id*., p.84:4-10 (question followed by extended colloquy), p.86:15-17 (question clarified and answered) (Miller was not aware that a deal received by a jailhouse informant in exchange for testifying in a case

16

qualified as *Brady* information);

➢ *Id.*, pp.87:23--88:15 and 88:16--89:13 (in response to a question regarding whether anything done on behalf of an informant would qualify as *Brady* material, Miller responded, "I told you earlier I didn't know if that was in *Brady*. I told you what I do. I gave a letter or the police reports. And as far as I'm concerned, my responsibility under *Brady* are through.");

➢ *Id.*, pp.127:4--128:23 (in response to a question regarding whether, if he heard an informant testify falsely about benefits he received, he had an obligation under *Brady* to bring that to the attention of the prosecuting District Attorney, Miller responded, "As I testified earlier, my opinion about *Brady* was, that once we forwarded all the reports to the district attorney with the appropriate copies, that we had complied with *Brady*");

➢ *Id.*, pp.235-13--236:6 ("As I stated earlier, the only thing I understand about *Brady* is that we are to turn everything over that we have to the district attorney, and he's to turn it over to the defense. Now, I know nothing further about *Brady*, about jailhouse snitches, or whatever you want to call them. That's as much as I know about *Brady*. When I hand the district attorney all the reports, as far as I know, my training, that we have complied with *Brady*, period."

In this case, Long Beach was on notice as a result of the *Brady* and *Giglio* decisions, *supra*, that it needed to have a system in place to ensure proper communication of Brady information. It is obvious that there was no system and no training. *Giglio*, speaking in the context of prosecutorial offices, noted the "prosecutor's office is an entity and as such it is the spokesman for the Government." It further noted that, "[t]o the extent this [the court's determination that the entity was responsible to ensure *Brady* compliance] places a burden on the

1   large prosecution offices, procedures and regulations can be established to carry

2   that burden and to insure communication of all relevant information on each case

3   to every lawyer who deals with it." *Giglio*, 405 U.S. at 154.

4         In 1980, the City of Los Angeles was the third largest city in the country,

5   and Los Angeles County was the third largest urban center in the country. See

6   http://en.wikipedia.org/wiki/Largest_cities_in_the_United_States_by_population_

7   by_decade#1980 and http://www.census.gov/population/www/documentation/

8   twps0027/tab01.txt. Thus, Long Beach certainly fits the standard of dealing with a

9   large prosecutorial office.

10        But for Eleventh Amendment immunity, the Los Angeles District Attorney's

11   Office would be legally responsible in this case for the failure to put in place a

12   *Brady/Giglio* system, as this Court acknowledged in dismissing Los Angeles

13   County.  The fact that the County has immunity does not absolve Long Beach

14   from its parallel responsibility. While Plaintiff has not found a case directly on

15   point regarding the responsibility of a police department, prosecutorial offices have

16   been held liable under *Brady/Giglio* for failure to train in Brady standards. *See*

17   *Thompson v. Connick* (person held in prison for 18 years on death row obtained

18   $14 Million verdict against the New Orleans District DA's Office based on jury

19   determination that Office was deliberately indifferent to the need to train, monitor,

20   and supervise its attorneys on *Brady* principles; verdict upheld by panel decision at

21   553 F.3d 836 (5th Cir. 2008), after which en banc review was granted; the verdict

22   was again upheld, this time by an equally divided en banc court, see 578 F.3d 293

23   (5th Cir. 2009).

24        While there is no directly analogous application of the *Giglio* principle to a

25   police department, the logic is inescapable. It is well established that police, as part

26   of the state, have a *Brady* obligation, although it is distinguished from the

27   prosecutor's in that the police obligation is to ensure that the proper prosecutorial

28   authority is provided *Brady* material. The Ninth Circuit's decision in *Jackson v.*

18

*Brown*, 513 F.3d 1057, 1073 (9th Cir 2008) indicates that parallel *Giglio* duties should apply to the police. When discussing *Giglio*, the Ninth Circuit specifically pointed out that police who offer benefits to informants, like prosecutors, "make any such promises as spokespersons for the government." *Jackson v. Brown*, 513 F.3d 1057, 1073 (9th Cir 2008). It was this understanding – that the government speaks as a single entity when promising benefits for testimony – that motivated the Supreme Court in *Giglio* to mandate the establishment of systems for disseminating information about informant benefits throughout the prosecutors' office. *See Giglio v. United States*, 405 U.S. 150, 155 (1972). Thus, the Ninth Circuit's reasoning in *Jackson* strongly indicates that any *Giglio* duty to disseminate information within the Los Angeles County District Attorney's Office should also apply within individual police departments themselves.

There is no qualified immunity to entity liability under *Monell* for the Long Beach Police Department. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (discussing policy reasons why qualified immunity is inapplicable to entity liability). *Modowan*, while not applying *Giglio's* requirement for a tracking system to a police department[6], did uphold against a motion to dismiss a *Monell* claim against the defendant for a failure to train officers in *Brady* principles. Thus, on that aspect of this motion, *Moldowan* is directly applicable.

We should not lose sight of the stakes involved in ensuring provision of *Brady* material to the defense in jailhouse informant cases. Jailhouse informants are used selectively. In Long Beach, they were only used in homicide cases. See Ex. 1163 (Letter from LBPD re use of informants). The stakes are life and death, both for the victims of crime, and for those charged with committing them. High level actors in the LBPD, acting directly on behalf of the Chief of Police, were regularly involved in the use of informants and the granting of benefits. See Exs. 1024, 1026 (letters in homicide cases seeking directly or indirectly benefits for

---

[6] It does not appear from the opinion that the issue was raised.

homicide informants).

In light of the egregious and pervasive nature of the *Brady* violations in Mr. Goldstein's case – which by itself is sufficient to establish entity liability here[7] – combined with the abysmal failure of training or understanding in basic *Brady* principles, Plaintiff Goldstein is entitled to summary judgment against the City, determining that 1) it failed to provide necessary systems and training to ensure compliance with *Brady* by its officers, particularly in the context of jailhouse informants, 2) that, in the context here, the failure constituted deliberate indifference as a matter of law, and 3) that these policies and failures "were the moving force behind the employee's violation of Gibson's constitutional rights, in the sense that the County could have prevented the violation with an appropriate policy." *Gibson v. County of Washoe, Nev.,* 290 F.3d 1175, 1194 (9th Cir. 2002).

## IV.    CONCLUSION

For the above reasons, Plaintiff respectfully requests the Court grant partial summary judgment against the City of Long Beach.

DATED: October 26, 2009          Respectfully Submitted,
                                 LITT, ESTUAR, HARRISON & KITSON LLP
                                 KAYE, MACLANE & BEDNARSKI LLP

                                 By:__/s/  Barrett S. Litt_____
                                     Barrett S. Litt
                                     Attorneys for Plaintiff

_____

[7] *See Grandstaff v. City of Borger, Texas, et al.,* 767 F.2d 161, 171 (5th Cir. 1985) (repeated acts of excessive force by different officers in several episodes on one night were sufficient to demonstrate "a disposition to disregard human life and safety so prevalent as to be police policy or custom"; the "disposition of the policymaker may be inferred from" the failure to take any remedial action in response to the events of the night in question). There is no evidence that Long Beach has ever acted to remedy the abysmal *Brady* failures of its detectives, even in the wake of it resulting in habeas grants in this and the *Jackson* case, to name two.