Barrett S. Litt, SBN 45527
E-Mail: blitt@littlaw.com
LITT, ESTUAR, HARRISON & KITSON, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114
Facsimile: (213) 380-4585

Ronald O. Kaye, SBN 145051
David MacLane, SBN 124952
Marilyn E. Bednarski, SBN 105322
Email: rok@kmbllp.com
KAYE, MACLANE & BEDNARSKI LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys For Plaintiff
THOMAS GOLDSTEIN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS GOLDSTEIN,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LONG BEACH, et al.,<br><br>Defendants. | CASE NO CV 04-9692 AHM (E)<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANT COLLETTE'S MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date:  November 23, 2009<br>Hearing Time:  10:00 A.M.<br>Courtroom:      14<br><br>Trial Date:     April 13, 2010 |

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................1

II.    **STATEMENT OF FACTS** ...............................................2

    A.   Collette Failed to Disclose Evidence that Informant Fink Received
        Benefits in Exchange for His Testimony against Goldstein ....................2

    B.   The Long Beach Police Department Suppressed Exculpatory
        Information Regarding McGinest's Drug Dealing Activities and the
        Source of the Police Department's Knowledge that McGinest
        Was Carrying a Significant Amount of Cash When He Was Killed.........3

        *1. Interview of Lester Hogan*.......................................................3

        *2. Interview of Carlton Smith*.....................................................4

        *3. The Long Beach Police Department Did Not Disclose these*
          *Interviews or the Critical Information they Revealed* ...........................4

    C.   Collette Provided Details about the McGinest Murder to Fink, Which
        Fink Then Put In The Form Of A False Confession by Goldstein. ...........6

    D.   Collette Improperly Influenced the Identification of Eyewitness
        Loran Campbell Causing him to Falsely Identify Goldstein as the
        Murderer.................................................................................7

III.   **DEFENDANT INAPPROPRIATELY ASKS THIS COURT TO
      IGNORE NINTH CIRCUIT PRECEDENT AND APPLY FOURTH
      CIRCUIT PRECEDENT TO GOLDSTEIN'S *BRADY* CLAIMS:
      UNDER NINTH CIRCUIT PRECEDENT PLAINTIFF IS ONLY
      REQUIRED TO SHOW THAT DEFENDANT COLLETTE ACTED
      WITH DELIBERATE INDIFFERENCE, NOT BAD FAITH** .................8

IV.   **A REASONABLE JURY COULD FIND THAT DEFENDANT
      COLLETTE LIABLE UNDER THE FIRST AND SECOND CLAIMS
      FOR RELIEF FOR INTENTIONALLY AND/OR RECKLESSLY
      SUPPRESSING *BRADY* EVIDENCE AND CONSPIRING WITH THE
      OTHER DEFENDANTS TO ACCOMPLISH THIS. .............................10**

    A.    Summary Judgment Standard .................................................10

i

B.   As A Member Of The Investigating Team, Defendant Collette Was Responsible To Ensure That Brady Was Complied With, And His Failure To Do So Makes Him Liable For Violation Perpetrated By Him Or Other Team Members. ..........................................................10

C.   Goldstein's Due Process Rights Were Violated by Virtue of the Government's Suppression of Exculpatory Information..................15

D.   Defendant Collette Recklessly or Intentionally Withheld Evidence that the Murder Victim Was a Drug Dealer and that the Police Knew that He was Carrying a Significant Amount of Money on the Night of His Murder before Interviewing Informant Fink ...............................16

E.   Defendant Collette Recklessly or Intentionally Withheld Evidence that Informant Edward Fink Was Receiving Benefits In Exchange for His Testimony. ..........................................................................19

F.   Collette Is Not Entitled to Qualified Immunity for Having Provided the Fink Benefit Letter to Ronald Ross ...................................................21

G.   Defendant Collette Provided Fink with Details about the Murder and Suppressed Evidence that He had Done So, thereby Assisting Informant Fink with the Fabrication of a False Confession. ...................................22

V.   **A REASONABLE JURY COULD FIND DEFENDANT COLLETTE LIABLE FOR IMPROPERLY INFLUENCING THE IDENTIFICATION OF EYEWITNESS LORAN CAMPBELL AND SUPPRESSING EVIDENCE OF THIS IMPROPER INFLUENCE......23**

VI.   **CONCLUSION ...........................................................................24**

ii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Manufacturers Mutual Insurance Co. v. Sullivan*
526 U.S. 40 (1999)…………………………………………………………………14

*Anderson v. Branen*
17 F.3d 552 (2d Cir. 1994)………………………………………………………11

*Arizona v. Youngblood*
488 U.S. 51 (1988)…………………………………………………………………..8

*Blankenhorn v. City of Orange*
485 F.3d 463 (9th Cir. 2007)……………………………………………………11

*Boyd v. Benton County*
374 F.3d 773 (9th Cir. 2004)……………………………………………………11

*Brady v. Maryland*
373 U.S. 83 (1963)………………………………………………………………14

*Braxton-Secret v. Robins Co.*
769 F.2d 528 (9th Cir.1985)……………………………………………………18

*Byrd v. Clark*
783 F.2d 1002 (11th Cir. 1986)…………………………………………………11

*California v. Campbell*
138 F.3d 772 (9th Cir. 1998) ……………………………………………………9

*Chuman v. Wright*
76 F.3d 292 (9th Cir. 1996) ……………………………………………………11

*Cornwell v. Electra Central Credit Union*
439 F.3d 1018 (9th Cir. 2006) …………………………………………………9

*Cunningham v. City of Wenatchee*
345 F.3d 802 (9th Cir.2003) ……………………………………………………8

iii

*Desert Palace, Inc. v. Costa*
539 U.S. 90 (2003) ................................................................................ 9

*Eastman Kodak Co. v. Image Technical Services, Inc.*
504 U.S. 451 (1992) ................................................................... 9, 17, 18

*Giglio v. United States*
405 U.S. 150 (1972) ....................................................................... 20, 21

*Hopkins v. Bonvicino*
573 F.3d 752 (9th Cir. 2009) ............................................................. 12

*Jackson v. Brown*
513 F.3d 1057 (9th Cir. 2008) ........................................................... 14

*Jones v. Williams*
297 F.3d 930 (9th Cir. 2002) ............................................................. 11

*Lippoldt v. Cole*
468 F.3d 1204 (10th Cir. 2006) ......................................................... 10

*Lolli v. County of Orange*
351 F.3d 410 (9th Cir. 2003) ............................................................. 11

*Malear v. Spears*
862 F.2d 1177 (5th Cir. 1989) ........................................................... 10

*Manson v. Brathwaite*
432 U.S. 98 (1977) .............................................................................. 24

*Masel v. Barrett*
707 F. Supp. 4 (D.D.C. 1989) ............................................................ 11

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*
475 U.S. 574 (1987) .............................................................................. 1

*Mendocino Environmental Ctr. v. Mendocino County*
192 F.3d 1283 (9th Cir.1999) .............................................................. 8

*Neil v. Biggers*
409 U.S. 188 (1972) ............................................................................ 24

*Newsome v. McCabe*
256 F.3d 747 (7th Cir.2001) ................................................................ 15

*Richman v. Sheahan*
512 F.3d 876 (7th Cir. 2008) ............................................................... 12

*Rutherford v. City of Berkeley*
780 F.2d 1444 (9th Cir.1986), *overruled on other grounds by Graham v. Connor*,
490 U.S. 386, (1989) ........................................................................... 10

*Smith v. Mensinger*
293 F.3d 641 (3d Cir. 2002) ................................................................ 11

*Tennison v. City and County of San Francisco*
570 F.3d 1078 (9th Cir. 2009) ...................................... 7, 8, 14, 15, 16

*United States v. Blanco*
392 F.3d 382 (9th Cir.2004) ............................................................... 14

*Youngblood v. West Virginia*
547 U.S. 867 (2006) ............................................................................ 15

*Castaneda v. Douglas County Sheriff's Investigator Rory Planeta*
2007 WL. 160816 (D. Nev. 2007) ...................................................... 12

*In re Jackson*
3 Cal. 4th 578 (1992) .......................................................................... 14

*McSherry v. Long Beach*
2009 WL. 3353043 (9th Cit 2009) ................................................. 7, 23

**STATE CASES**

*Summers v. Tice*,
33 Cal. 2d 80 (1948) ........................................................................... 12

**FEDERAL STATUTES**

Fed. R. Civ. P. 56(c) .............................................................................. 9

v

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Collette's motion for summary judgment has no merit and should be denied in whole. Defendant Collette was one of the officers primarily responsible for the murder investigation that led to Mr. Goldstein's wrongful conviction. (Plaintiff's Additional Material Facts ¶2.) He assisted with the investigation throughout its entire duration (*Id.* ¶1.)

Indeed, substantial evidence supports the fact that he was personally involved in all of the constitutional violations that caused Mr. Goldstein's wrongful conviction: providing assistance to informant Edward Fink in manufacturing a false confession against Goldstein (Collette admits that he was one of the officers who interviewed Fink); withholding evidence of benefits provided to Fink in exchange for his testimony against Goldstein (Collette admits that he wrote a letter mentioning Fink's testimony and requesting a reduction of the charges against him); improperly influencing eyewitness Loran Campbell to make a false identification of Goldstein (the statements of Loran Campbell himself strongly indicate that Collette was one of the officers involved); suppressing evidence of this improper influence on Campbell's testimony; and suppressing exculpatory information regarding the murder victim's drug dealing activities, and the police department's source of information that the victim was carrying a large sum of money at the time of his murder.

Although plaintiff is only required to show a genuine issue of material fact to defeat Collette's motion for summary judgment, *see* Federal Rule of Civil Procedure 56(c); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1987), on numerous issues in this case there is substantial evidence supporting plaintiff's allegations against defendant Collette.

## II.   STATEMENT OF FACTS

On the night of November 3, 1979 John McGinest was killed with a shotgun near the corner of 12th Street and Pine Street in Long Beach. (Collette Statement of Uncontroverted Facts 1, 2.) Long Beach Police detectives Collette and Miller responded to the scene on the night of the murder. (Collette Statement of Uncontroverted Facts 4-5.) Defendant Collette continued to assist on the McGinest murder investigation throughout its duration (Plaintiff's Additional Material Facts ¶1) and was one the detectives primarily responsible for this investigation (*id.* ¶2). At the time of the murder investigation, it was the practice of Long Beach police detectives who were assigned to a case to share with one another everything of significance to the investigation. (*Id.* ¶11.)

Thomas Goldstein was convicted of the McGinest murder on the basis of the testimony of a jailhouse informant later determined to have committed perjury, and an eyewitness who later admitted that he could never really identify Goldstein as the murderer, but had chosen him because the police suggested that Goldstein was guilty, and pulled his photo out of a photo line up. (*Id.* ¶31.) Several other eyewitnesses indicated that Mr. Goldstein was not the murderer. (*Id.* ¶32.) In 2004 Goldstein was granted habeas corpus because the Constitutional violations in the investigation and prosecution of the case against him undermined confidence in the verdict. (Plaintiff's Additional Material Facts ¶ 33.)

### A.   COLLETTE FAILED TO DISCLOSE EVIDENCE THAT INFORMANT FINK RECEIVED BENEFITS IN EXCHANGE FOR HIS TESTIMONY AGAINST GOLDSTEIN

At Goldstein's trial, jailhouse informant Edward Fink falsely testified that Mr. Goldstein had confessed to him. (Plaintiff's Statement of Additional Facts ¶38.) In exchange for his testimony against Goldstein, he received assistance from law enforcement in reducing or eliminating charges pending against him. (*See* Plaintiff's Response to Collette Statement of Uncontroverted Facts 93.)

Defendant Collette admits that he interviewed Fink, and drafted a letter suggesting a County lid (sentence under one-year) in the pending felony theft charges against Fink. (*See* Collette Statement of Uncontroverted Facts 13, 18, 35.) Inferences from the existing evidence strongly indicate that the original promises made to Fink regarding assistance in the cases pending against him were made by Collette during his interviews of Fink on November 19th-20th, 1979. (*See* Plaintiff's Response to Collette Statement of Uncontroverted Facts 42, 44.)

The prosecutors assigned to Mr. Goldstein's case never received a copy of the letter drafted by Collette. (Plaintiff's Additional Material Facts ¶9.) In fact they never received any information whatsoever about any of the benefits given to Fink in exchange for his testimony. (Plaintiff's Additional Material Facts ¶34.) The nondisclosure of this letter, of the deal entered into the same day the prosecutor noted that Colleltte was to write a letter requesting a County lid for Fink, and other evidence of benefits received by Fink in exchange for his testimony against Goldstein was one of the reasons the Goldstein's conviction was eventually overturned. (Plaintiff's Additional Material Facts ¶28.)[1]

**B.    THE LONG BEACH POLICE DEPARTMENT SUPPRESSED EXCULPATORY INFORMATION REGARDING MCGINEST'S DRUG DEALING ACTIVITIES AND THE SOURCE OF THE POLICE DEPARTMENT'S KNOWLEDGE THAT MCGINEST WAS CARRYING A SIGNIFICANT AMOUNT OF CASH WHEN HE WAS KILLED.**

*1.        Interview of Lester Hogan*

Lester Hogan, one of McGinest's friends, saw McGinest the morning before he was killed, at which time McGinest showed Hogan a "wad" of cash and explained that he was going to buy a pound of marijuana that night with the money. (Plaintiff's Additional Material Facts ¶¶4-5.) The next day (November 4,

---

[1] These facts are presented in greater detail in plaintiff's pending Motion For Partial Summary Judgment On The Issues Of Whether Certain Identified

1979), plainclothes police officers from the Long Beach Police Department came
to Hogan's house to speak with him about the murder. (Plaintiff's Additional
Material Facts ¶6.) According to Hogan, he probably told the police officers who
visited his house on November 4th that McGinest had been carrying a large sum of
cash for the purpose of purchasing marijuana on the night of his murder.
(Plaintiff's Additional Material Facts ¶7.)

### 2.    Interview of Carlton Smith

At the time of the McGinest murder, Carlton Smith lived in the same
apartment building as Mr. Goldstein. (Plaintiff's Additional Material Facts ¶26.)[2]
Unnamed plainclothes officers interviewed Carlton Smith on November 16, 1979
(before Edward Fink first spoke with Detectives Collette and Wren). (Plaintiff's
Additional Material Facts ¶20.) While questioning Smith, the officers stated that
McGinest was in the "same business" as Smith, which Smith understood to mean
drugs as he had been arrested for possession of marijuana for sale. (Plaintiff's
Additional Material Facts ¶21.) The officers also told Smith that McGinest had
"like $1200" in his pocket when he was murdered. (Plaintiff's Additional Material
Facts ¶22.)

### 3.    The Long Beach Police Department Did Not Disclose these Interviews or the Critical Information they Revealed

The Long Beach Police Department never memorialized the interviews of
Hogan and Smith, and never provided information about these interviews to the
prosecution or the defense. (Plaintiff's Additional Material Facts ¶¶8, 20, 23.) In
fact, the Long Beach detectives never disclosed any information whatsoever
showing that McGinest was involved in the sale of drugs; nor did they disclose the

---

Information Allegedly Withheld Was Exculpatory And Material Under The
Standards Of *Brady v. Maryland*, §II (C), pp. 6-14.

[2] Notably, according to Carlton Smith, another person (Wilbur Smith) who lived in
the same apartment building as Goldstein and rented a garage in this building

4

fact that they were aware that McGinest was carrying a large amount of money before interviewing Fink. (Plaintiff's Additional Material Facts ¶¶19, 24.)

The deputy district attorney who prosecuted Mr. Goldstein, Tim Browne, was unaware at the time he tried the *Goldstein* case that the Long Beach Police Department had information that Mr. McGinest was involved in selling drugs. (Plaintiff's Additional Material Facts ¶17) No evidence was presented at the trial regarding the fact that Mr. McGinest was involved in selling drugs. (Plaintiff's Additional Material Facts ¶18.) Such evidence would have undermined the prosecution's theory of the case as a robbery-murder. (Plaintiff's Additional Material Facts ¶13.) Moreover, evidence that the murder was drug related would have exculpated Goldstein since there was absolutely no evidence that he was involved in drug dealing. (Plaintiff's Additional Material Facts ¶39.)

Mary McGinest, the decedent's mother, testified during the *Goldstein* trial that she saw her son a few days before his murder with a large sum of money. (Plaintiff's Additional Material Facts ¶14.) Although there is no transcript of the DDA Browne's closing argument, it was a central tenet of the prosecution's position in the case that Fink could only have learned that McGinest had money on him from Mr. Goldstein. (Plaintiff's Additional Material Facts ¶12.) DDA Browne used this detail to bolster the credibility of Fink's claim that Goldstein confessed to him, arguing that Fink could only have learned this information from Mr. Goldstein himself. (Plaintiff's Additional Material Facts ¶¶13,15.)

If he had been provided information that McGinest was dealing drugs, or that the police knew he was carrying a large sum of money before interviewing Fink, DDA Browne would have provided this information to Mr. Goldstein's

---

owned a shotgun (the murder weapon in this case). (Plaintiff's Additional Material Facts ¶27.)

attorney since he recognizes it as *Brady* material. He did not because it had never been presented to him.[3]

### C. COLLETTE PROVIDED DETAILS ABOUT THE MCGINEST MURDER TO FINK, WHICH FINK THEN PUT IN THE FORM OF A FALSE CONFESSION BY GOLDSTEIN.

As shown by the testimony of Carlton Smith, the detectives on the Long Beach Police Department was aware, several days before Collette's first interview with Fink, that McGinest was carrying a substantial amount of cash on him at the time of his murder. (*See* Plaintiff's Additional Material Facts ¶22.) Mr. Goldstein did not tell Edward Fink anything about McGinest owing him money or that he got his shotgun to collect money from McGinest. (Plaintiff's Additional Material Facts ¶17.) The evidence supports the inference that Collette sent Fink back to the jail to obtain more information, or a confession, from Mr. Goldstein after the first interview and, in preparation for this task, Collette supplied Fink with details about the murder, including the fact that McGinest was carrying a substantial amount of cash (*see* Plaintiff's Response to Collette's Statement of Uncontroverted Facts 23). Fink used this information supplied by Collette (and Wren, or at least with Wren's knowledge) to concoct a false confession that he claimed was made by Mr. Goldstein. (*See* Plaintiff's Response to Collette's Statement of Uncontroverted Facts 23.)[4]

---

[3] Facts about the Fink deal are further elaborated in the contemporaneously filed Opposition to Defendant Wren's Motion for Summary Judgment, and are not repeated here.

[4] Such information can be communicated in many ways, ranging from consciously providing the information, allowing access to files, or asking questions that convey information (e.g., what did he tell you about the money McGinest had on him?). See Ex. 1162, p.33 (Grand Jury Report) ("Copies of arrest reports, case files, and photographs of victims are shown to informants. Police remove informants from the jail and drive them to the scene of the crime charged against the targeted defendant. Law enforcement officials also orally equip informants with information necessary to falsify a defendant's confession. ¶Sometimes law enforcement are less blatant when feeding informants facts about a case. An

**D.** **COLLETTE IMPROPERLY INFLUENCED THE IDENTIFICATION OF EYEWITNESS LORAN CAMPBELL CAUSING HIM TO FALSELY IDENTIFY MR. GOLDSTEIN AS THE MURDERER**

Loran Campbell was the only eyewitness to make a positive identification of Mr. Goldstein at trial. (Plaintiff's Additional Material Facts 41.) During Goldstein's habeas corpus proceedings, Campbell admitted that he could never really identify Goldstein as the murderer. Campbell explained that he only identified Mr. Goldstein because the police pulled Goldstein's photo out of a set of six photographs when Campbell was unable to identify anyone. (Plaintiff's Additional Material Facts ¶¶42-43.) Before Campbell testified at Mr. Goldstein's preliminary hearing, police reassured him they were confident Goldstein was guilty and provided him with information they suggested demonstrated Goldstein's guilt. (Plaintiff's Additional Material Facts ¶¶44.) Goldstein was granted habeas corpus in part because of this improper influence exercised by the police over Campbell's identification. (Plaintiff's Additional Material Facts ¶29.)

Although Collette denies having any substantial interaction with Campbell, inferences from Campbell's testimony indicate that Detective Collette was one of the officers who improperly influenced him causing him to making a false identification of Mr. Goldstein. (Plaintiff's Additional Material Facts ¶30.)

---

example of the indirect method of furnishing information arises after an informant denies hearing incriminating evidence. The official then responds, 'Don't you remember about . ,' supplying critical facts about the particular case. The informant can then piece together enough details of the crime to fabricate a confession."

**ARGUMENT**

**III.  DEFENDANT INAPPROPRIATELY ASKS THIS COURT TO IGNORE NINTH CIRCUIT PRECEDENT AND APPLY FOURTH CIRCUIT PRECEDENT TO MR. GOLDSTEIN'S *BRADY* CLAIMS: UNDER NINTH CIRCUIT PRECEDENT PLAINTIFF IS ONLY REQUIRED TO SHOW THAT DEFENDANT COLLETTE ACTED WITH DELIBERATE INDIFFERENCE, NOT BAD FAITH**

Under Ninth Circuit precedent, Goldstein is required to show that Defendants acted with deliberate indifference or reckless disregard to his rights or the truth when they withheld exculpatory evidence. *Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). The Ninth Circuit has explicitly stated that civil rights plaintiffs are "not required to establish that [law enforcement] acted in bad faith in withholding the evidence." *Id.*

There is no ambiguity regarding the applicable standard. Nonetheless, Collette attempts to confuse the issue by discussing the Fourth Circuit's standard at length [5] (Collette's Memo. of Points & Authorities in Support of Mot. For Summary J., pp.9-11) and asserting that the Ninth Circuit precedent is "clouded by inconsistencies." (Collette's Memo. of Points & Authorities in Support of Mot. For Summary J., p.8). As support for his assertion that that Ninth Circuit precedent on this issue is ambiguous, Collette cites *McSherry v. Long Beach*, 2009 WL 3353043 (9th Cit 2009). However *McSherry* does not require a plaintiff to prove that law enforcement acted in bad faith when failing to disclose exculpatory evidence. Rather, *McSherry* requires bad faith be proven for failure to *preserve or collect*

---

[5] Despite Defendant Collette's assertion that he intends to apply *Tennison*'s deliberate indifference standard in the analysis of his motion for summary judgment (Collette's Memo. of Points & Authorities in Support of Mot. For Summary J. at 9), he goes on to quote large sections of a Fourth Circuit case propounding the use of a bad faith standard and argues that *Tennison* should be rejected in favor of the Fourth Circuit standard (*id.* at 9-11), concluding that actual constitutional duty imposed on police lies "[s]omewhere in the contours of [the Fourth Circuit's holding in] *Jean* and [the Ninth Circuit's holding in] *Tennison*."

*potentially* exculpatory evidence. *McSherry* at *5.[6] In contrast to the plaintiff in *McSherry*, Mr. Goldstein's claims are based on defendant detectives' failure to disclose exculpatory evidence *actually in their possession*. (*See* Third Amended Complaint, pp.32-36.)

Thus, Collette's request for summary judgment regarding plaintiff's *Brady* claims must be denied if there is any evidence that would allow a reasonable jury to find that Collette recklessly withheld *Brady* evidence. As discussed in the sections below, substantial evidence supports plaintiff's *Brady* allegations. Much of this evidence indicates that Collette not only recklessly, but intentionally, withheld this evidence.

This is especially so since summary judgment is highly disfavored on the basis of a failure of proof of state of mind. *See, e.g., Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1302 (9th Cir.1999) ("Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action. *See Magana,* 107 F.3d at 1447; *Kunik,* 946 F.2d at 1580; *Hampton,* 600 F.2d at 620-21. Moreover, "[q]uestions involving a person's state of mind ... are generally factual issues inappropriate for resolution by summary judgment." *Braxton-Secret v. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985).") Thus, even if the standard was bad faith, defendant Collette would not be entitled to summary judgment on that basis. Instead, the real issue is whether there is evidence that defendant Collette may be found to have violated *Brady* itself. As we discuss, there is ample evidence that he did so.

---

[6] A point that is in accord with *Tennison. See Tennison*, 570 F.3d at 1087 (distinguishing *Brady* claim from the claim for non-preservation and collection of exculpatory evidence raised in *Cunningham v. City of Wenatchee,* 345 F.3d 802 (9th Cir.2003) and *Arizona v. Youngblood*, 488 U.S. 51 (1988))

**IV.    A REASONABLE JURY COULD FIND THAT DEFENDANT COLLETTE LIABLE UNDER THE FIRST AND SECOND CLAIMS FOR RELIEF FOR INTENTIONALLY AND/OR RECKLESSLY SUPPRESSING *BRADY* EVIDENCE AND CONSPIRING WITH THE OTHER DEFENDANTS TO ACCOMPLISH THIS.**

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Inferences drawn from the evidence, however, must be viewed in the light most favorable to the non-moving party. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 US 451, 456 (1992). In addition, circumstantial evidence alone may create a genuine issue of material fact, sufficient to defeat a motion for summary judgment. *Cornwell v. Electra Central Credit Unio,* 439 F3d 1018, 1029–1030 (9th Cir. 2006); *Desert Palace, Inc. v. Costa,* 539 US 90, 100 (2003) (observing that, in civil litigation generally, circumstantial evidence "may be more certain, satisfying and persuasive than direct evidence").

### B.    AS A MEMBER OF THE INVESTIGATING TEAM, DEFENDANT COLLETTE WAS RESPONSIBLE TO ENSURE THAT *BRADY* WAS COMPLIED WITH, AND HIS FAILURE TO DO SO MAKES HIM LIABLE FOR VIOLATION PERPETRATED BY HIM OR OTHER TEAM MEMBERS.

As a primary member of the team assigned to the McGinest murder investigation, Collette was responsible for ensuring that any *Brady* information generated during the investigation reached the prosecutor handling the Goldstein case. (*See* Plaintiff's Additional Material Facts ¶10.) Although Collette attempts to portray his role in the Goldstein investigation as minimal, this contradicts the statements of his fellow officers MacLyman and Miller, who describe him as being on the team assigned to the case. (Plaintiff's Additional Material Facts ¶2.) It also

contradicts substantial documentary evidence, such as police reports and interview reports filed by or mentioning Collette, and the fact that the criminal complaint against Goldstein was made by Collette. (*See* evidence supporting Plaintiff's Additional Material Facts ¶1.)

As discussed in the sections below, the evidence indicates that Collette was personally aware of the existence of all of the *Brady* material that was suppressed in this case and was, in fact, the principal source for some of this material, such as the benefits given to Fink in exchange for his testimony. As a primary member of the team investigating this case, Collette was personally responsible—along with the other member of the team—for ensuring that *Brady* material reached the prosecutor under Long Beach Police Department standards. (Plaintiff's Additional Material Facts ¶10.)

Leaving aside LBPD standards, Collette was constitutionally responsible for ensuring that *Brady* obligations were met in a matter for which he was a principal investigator. This includes addressing violations by other officers of which he was aware. *See e.g., Malear v. Spears*, 862 F2d 1177, 1185, 1186 (5th Cir. 1989) (liability attaches to officer actually participating in unconstitutional search even though his participation was to a lesser degree than that of his partner); *Lippoldt v. Cole*, 468 F.3d 1204, 1219-1220 (10th Cir. 2006) (holding liable an assistant district attorney who researched and drafted letter unconstitutionally denying parade permit, despite the fact that she did not sign or issue the letter, as well as sufficient causal connection to find individual liability of police officer whose actual participation was limited to signing the letter on behalf of his superior, the police chief); *Rutherford v. City of Berkeley,* 780 F.2d 1444, 1447 (9th Cir.1986) (plaintiff could not identify which officer among several actually kicked or punched him, but could establish that they were all among the officers surrounding and beating him; despite individual officers' denial of beting, jury "could reasonably infer that the named officers were participants in punching or kicking

Rutherford"), *overruled on other grounds by Graham v. Connor,* 490 U.S. 386, (1989); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."); *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (reversing dismissal where a fact finder could find that the defendant corrections officer knew that his fellow officers were beating up the plaintiff inmate, that he had an opportunity to intervene and that he refused to do so"); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citations omitted); *Masel v. Barrett*, 707 F. Supp. 4 (D.D.C. 1989) (noting that all circuits recognize that police officer in special relationship with victim has constitutionally derived duty to protect victim from constitutional violations by other police officers).

The Ninth Circuit has addressed this issue of the degree of involvement needed to find liability in several cases, ruling that the officer must have "either integral participation or personal involvement [in the constitutional violation]… before a jury could find officers liable." *Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002), citing *Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996) (not enough to be present at the scene to hold an officer liable). *See also Lolli v. County of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) ("jury could infer that the individual officers who had physical contact with Lolli participated in the alleged beating"); *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) ("An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation. [citing *Chuman*] [Integral participation] does require some fundamental involvement in the conduct that allegedly caused the violation") (second bracket in original); *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004)

("'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation"); *Hopkins v. Bonvicino*,  573 F.3d 752, 770  (9th Cir. 2009) ("the 'integral participant' rule…extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves"); *Castaneda v. Douglas County Sheriff's Investigator Rory Planeta*, 2007 WL 160816 (D. Nev. 2007), subsequent determination, 2007 WL 3232528 (D. Nev. 2007) (for officer "to be considered an integral participant" s/he "must be more than a mere bystander to the underlying police action. Rather, the officer must be performing some function necessary to the completion of a police goal").

In a recent discussion of the different forms of joint liability of co-equal officers under §1983 by the Seventh Circuit, *Richman v. Sheahan*, 512 F.3d 876, 885 (7th Cir. 2008), a case involving multiple officers restraining an inmate who died, Judge Posner suggests that there are four ways for multiple defendants to be liable: 1) each defendant did discrete acts that made the injury a little worse, making each liable for the incremental harm each caused: 2) each defendant could have inflicted the entire injury in that eachs' actions were enough to cause the entire harm, making them jointly and severally liable; 3) each defendant committed a wrongful act, but it is unclear which defendant's act caused the injury (the *Summers v. Tice*,  33 Cal.2d 80 (1948) secenario, again making each jointly and severally liable; and

> "[F]ourth, one defendant might commit the act that causes the harm yet the other be sued as well because he could have prevented the harm but did not…. But there is an exception [from the rule that a police officer has no obligation to provide protection to the general public] for the case in which the officer is responsible for creating the peril that creates an occasion for rescue, as when, having arrested a drunken driver, the officer removes the key from the ignition of his car, as a result stranding the passengers late

13

at night in an unsafe neighborhood, and he does nothing to protect them and they are robbed by local marauders and sue him for battery or for having deprived them of (a form of) liberty without due process of law. *Wood v. Ostrander,* 879 F.2d 583, 586-87 (9th Cir.1989); see *Monfils v. Taylor,* 165 F.3d 511, 517 (7th Cir.1998).

"Suppose now that there are two arresting officers, and both drive off together, abandoning the passengers to their fate, though only one had removed the key from the ignition of the arrested driver's car. *The other officer, provided he knew or should have known what the first officer had done, would be liable along with the first officer as a participant in the conduct giving rise to the peril.*" (Emphasis supplied).

We have quoted this at length because it is a good exposition of the issues in this case, where there are multiple defendants who were responsible for, or participated in, the McGinest death, which ultimately resulted in the Goldstein prosecution, particularly of the framework for an officer knowing of a constitutional violation and failing to remediate it. In some instances (e.g., the interviews of Loran Campbell and Edward Fink), who participated is known. In other instances (e.g., the interviews of Lester Hogan and Carlton Smith), who participated is not known, but the evidence is overwhelming that it was one of the defendants performing specific investigative acts as part of the investigation. The evidence is also clear that, given the standards that important information should be shared among the participating detectives, they each would have known of the *Brady* information that was not disclosed, and therefore were responsible to ensure that it reached the Goldstein prosecutors. Each of the defendants, including defendant Collette, "knew or should have known" of the *Brady* information and is "liable along with the [other] officer[s] as a participant in the conduct giving rise" to the constitutional violation. *Richman v. Sheahan, supra.* Defendant Wren is liable under scenarios 2, 3 and 4 of Judge Posner's framework.

14

## C.   GOLDSTEIN'S DUE PROCESS RIGHTS WERE VIOLATED BY VIRTUE OF THE GOVERNMENT'S SUPPRESSION OF EXCULPATORY INFORMATION.

To prevail on a §1983 claim, a plaintiff must establish (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) the alleged deprivation was committed under color of state law. *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999). Violations of Mr. Goldstein's due process rights occurred as a result of the government's failure to disclose material and exculpatory evidence, as mandated by *Brady v. Maryland.* 373 U.S. 83, 87 (1963) (the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution.").

The government's obligation to disclose exculpatory evidence extends to law enforcement officers. *Tennison v. City and County of San* Francisco, 570 F.3d 1078, 1087 (9th Cir. 2009); *United States v. Blanco,* 392 F.3d 382, 388 (9th Cir.2004) (holding that exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does); "*Giglio's* focus on the responsibility of the prosecutor to investigate all promises made on behalf of the government extends to promises made by the police, who also make any such promises as spokespersons for the government, and for whom the prosecutor bears responsibility." *Jackson v. Brown,* 513 F.3d 1057, 1073 (9th Cir. 2008), cited to the California Supreme Court decision in *In re Jackson*, 3 Cal.4th 578, 593-93 (1992). To exempt police from *Brady* obligations would allow "the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them." *Blanco at 388. See also Youngblood v. West Virginia,* 547 U.S. 867, 869-70, (2006) (per curiam) ("*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police

investigators and not to the prosecutor," quoting *Kyles v. Whitley,* 514 U.S. 419, (1995)); *Newsome v. McCabe,* 256 F.3d 747, 752-53 (7th Cir.2001) (stating that it was clearly established in 1979 and 1980 that police could not withhold exculpatory information about fingerprints and the conduct of a lineup from prosecutors). Under §1983, Police officers are liable for *Brady* violations where their actions exhibited deliberate indifference to or reckless disregard for the accused rights for truth in withholding information from prosecutors. *Tennison* 570 F.3d at 1089.

Plaintiff contends that the homicide investigation team, including Detective Wren, suppressed the following categories of evidence: (1) information regarding McGinest's drug dealing, particularly information generated through the Hogan and/or Smith interviews; (2) information regarding McGinest's possession of money acquired from persons other than Fink; (3) detectives' disclosure of details regarding the McGinest murder to Fink; (4) evidence that Fink received promises of leniency in exchange for his testimony; (5) the specific terms of the deal received by Eddie Fink; and  (6)police activities in influencing Loran Campbell's identification of Mr. Goldstein.

All of this information was exculpatory, material and subject to disclosure under *Brady*.[7]

D. **DEFENDANT COLLETTE RECKLESSLY OR INTENTIONALLY WITHHELD EVIDENCE THAT THE MURDER VICTIM WAS A DRUG DEALER AND THAT THE POLICE KNEW THAT HE WAS CARRYING A SIGNIFICANT AMOUNT OF MONEY ON THE NIGHT OF HIS MURDER BEFORE INTERVIEWING INFORMANT FINK**

---

[7] This issue has been briefed at length in plaintiff's pending Motion For Partial Summary Judgment On The Issues Of Whether Certain Identified Information Allegedly Withheld Was Exculpatory And Material Under The Standards Of *Brady v. Maryland*, §III, and the Court is referred to that discussion for a full discussion of why this is *Brady* material.

16

The fact that McGinest was a drug dealer carrying a significant amount of money on the night of his murder for the express purpose engaging in high value drug purchase and that the police were aware of this before ever speaking to Fink is critical exculpatory information. As discussed, *supra* (*see* Statement of Facts section II), it is clear that the defendant detectives' were aware of these facts from their interviews of Lester Hogan and Carlton Smith. However this evidence was suppressed by Collette and the other defendants (*see* Statement of Facts section II.C) in violation of *Brady*.

Even if the defendant detectives did not generate any specific notes or reports regarding this information, this does not convert Mr. Goldstein's *Brady* claim into a claim for negligent investigation as Collette attempts to argue. (Collette's Memo.of Points & Authorities in Support of Mot. for Summary J. ¶¶12-13.) As explained by the Ninth Circuit in *Tennison,* the *Brady* violation consists in the fact that police possessed "extensive [undisclosed] information regarding the murder, including information that contradicted the account of [a] key witness," not the fact that they failed to document this information, or to follow certain investigation protocols. *Tennison*, 570 F.3d at 1091, n.6.

In his desperation to convince this Court that he is not liable for Mr. Goldstein's wrongful conviction, Defendant Collette attempts to argue that there is no exculpatory value or relevance in the information that McGinest was involved in drug dealing, that he intended to buy large quantity of drugs on the night of his murder, and that the police were aware of these facts before speaking to Fink. (Collette's Memo. of Points & Authorities in Support of Mot. For Summary J. ¶¶12-13.) Nothing could be further from the truth.

This information contradicts both the theory of the murder advanced by the police that Goldstein killed McGinest in a robbery-murder based on an unpaid debt, and the testimony of informant Fink who asserted that Goldstein confessed to having murdered McGinest in an attempt to collect a debt. Moreover, this

information is inconsistent with Mr. Goldstein's alleged guilt, since the police had absolutely no evidence that he was involved in drug dealing. Finally, the fact that the Long Beach Police Department ("LBPD") had knowledge of the money carried by McGinest from sources other than Fink, strongly undercuts one of the primary arguments used to bolster Fink's credibility at trial.

Detective Collette's assertion that he does not recall participating in interviews with Smith or Hogan (Collette's Statement of Uncontroverted Facts 9-11) does not refute Mr. Goldstein's *Brady* claim on these issues. While it may be true that, thirty years after the investigation Collette does not recall these interviews, his failure to recall them does not prove that he did not participate in them. He has not asserted any facts that would establish that he did not participate. It is undisputed that some detectives did. Substantial circumstantial evidence supports the inference that Collette did personally participate in the interview of Lester Hogan. This interview was performed by two plainclothes officers (i.e., detectives), it occurred before MacLyman began working on the investigation, and Collette and Miller were the detectives working the case at that time. On the basis of these facts, for the purposes of summary judgment it must be inferred that Collette participated in this interview. *See Eastman Kodak Co. v. Image Technical Services, Inc.* 504 US 451, 456 (1992) (inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party.)

Likewise, strong circumstantial evidence indicates that Collette was aware of the facts recited by the police during the Carlton Smith interview (i.e., that McGinest was a drug dealer carrying a substantial amount of money at the time of his murder) even if he did not participate in the interview. Collette was one of the primary detectives on the investigation, detectives assigned to a case shared important information regarding the case, and the information conveyed to Smith likely came from Hogan (whose interview Collette probably did participate in).

1  Thus, regardless of whether Collette interviewed Smith, the inferences indicate he
2  was privy to the critical *Brady* evidence revealed by this interview.

3        The evidence is extremely strong that Detective Collette knew or should
4  have known of this information and failed to produce it. It is unnecessary for this
5  motion to establish whether this was done intentionally, recklessly or in bad faith.
6  As discussed previously, "[q]uestions involving a person's state of mind ... are
7  generally factual issues inappropriate for resolution by summary judgment."
8  *Braxton-Secret v. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985). This was clearly
9  critical, on-point evidence of an alternative theory of the murder that was
10 inconsistent with Goldstein's alleged guilt and with the testimony of Fink. *See*
11 discussion and cases cited in plaintiff's pending Motion For Partial Summary
12 Judgment On The Issues Of Whether Certain Identified Information Allegedly
13 Withheld Was Exculpatory And Material Under The Standards Of *Brady v.*
14 *Maryland*, §III (B), pgs. 20-22. Revelation of this information would have
15 undermined the case against Mr. Goldstein—a fact which could not have been lost
16 on experienced detectives, such as Collette. Thus, it can be it can be reasonably
17 inferred—and must be inferred for the purposes of Collette's summary judgment
18 motion, *see Eastman Kodak Co.*, 504 US at 456—that the Long Beach police,
19 including defendant Collette, intentionally suppressed this evidence.

20    **E.    DEFENDANT COLLETTE RECKLESSLY OR INTENTIONALLY**
21          **WITHHELD EVIDENCE THAT INFORMANT EDWARD FINK WAS**
          **RECEIVING BENEFITS IN EXCHANGE FOR HIS TESTIMONY.**
22

23       The evidence before this Court strongly supports the inference that
24 Defendant Collette recklessly withheld evidence that informant Edward Fink was
25 receiving benefits for his testimony, including a letter drafted by Collette himself
26 suggesting consideration for Fink. (Plaintiff's Statement of Additional Facts 9, 34-
27 38).

28       Defendant Collette attempts to avoid liability for having withheld this
   evidence by making the absurd assertion that Fink did not receive benefits—an

assertion contradicted by the record before this Court, common sense, and the findings of United States Magistrate Judge Block during Goldstein's habeas proceedings. As a result of the deal between Fink and law enforcement, felony theft charges pending against Fink—who had numerous prior convictions and was already on parole for a prior conviction—were reduced to a 58-day county jail sentence with 43 days credit for time served and his probation violations were taken off calendar. (Plaintiff's Statement of Additional Facts ¶¶35-36.)

Moreover, the letter drafted by Defendant Collette is evidence of a deal in exchange for testimony on it face. It mentions Fink's testimony in "an upcoming homicide case" (a reference that Collette admits is to the *Goldstein* case) and immediately after this suggests a "County sentence" (i.e., a sentence under one year in County jail) would be appropriate. (*See* Ex. 1026.) Additionally, charges pending against Fink in Orange County were dismissed as a result of Fink's testimony against Mr. Goldstein. (Plaintiff's Statement of Additional Facts ¶37.) Collette's incredible claim that Fink received no benefits must be rejected.[8]

Collette also seeks to avoid liability by claiming that he provided information about the benefits received by Fink to the district attorney's office, and directly to the deputy district attorney handling Mr. Goldstein's preliminary hearing. (*See* Collette Statement of Uncontroverted Facts 37.) This claim is contradicted by the sworn declaration of the prosecutors who handled Goldstein's case. They state they had no knowledge of the benefits (Plaintiff's Statement of Additional Facts ¶34). It is also contradicted by the fact that no record of these benefits is listed in the district attorney's case notes for the Goldstein file (*See*

---

[8] Defendant Collette relies heavily on the opinion of Ronald Ross to argue that the Fink deal was not a benefit. Mr. Ross is a self-interested party since he has admitted that he knew of this information, and did nothing to ensure that it was disclosed to the defense. As we have argued in our pending *Brady* motion, whether this information was exculpatory and material is a question of law since the facts are not in dispute. Mr. Ross' opinion is of no consequence.

20

Defendants' Ex. 2005).[9] Moreover it can be inferred that neither the Goldstein prosecution nor his defense had any knowledge of Fink's benefits since this information was not brought out at trial in response to Fink's false testimony that he received no benefits.

In his opposition, Collette also makes the patently false assertion that the benefit letter he wrote for Fink (Ex 1026) is referenced in the Goldstein case notes (Collette's Memo of Points & Authorities in Support of Summary J., p.14:13-14.) It appears that Collette is confusing the Goldstein case file notes (Defendants' Ex. 2005), which contain no reference to such a letter, with the Fink case file notes (Ex. 2004), which do reference it.

Although certain individuals within the prosecutor's office did have knowledge of the benefit letter written by Collette—the letter was addressed to Ronald Ross and referenced in the Fink case file notes—this does not relieve Collette of his *Brady* duty to ensure that the prosecutors working on Goldstein's case knew of the benefits. *See Giglio v. United States*, 405 U.S. 150, 155 (1972); *See also* Plaintiff's Motion for Summary Judgment Against City of Long Beach, p.9.

### F. COLLETTE IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HAVING PROVIDED THE FINK BENEFIT LETTER TO RONALD ROSS

Collette contends that he is entitled to qualified immunity because a reasonable officer in his shoes would have believed that the prosecutor's office would distribute information about Fink's benefits, including Collette's letter (Exhibit 1026), to the prosecutors working on the Goldstein case. (Collette's Memo. of Points & Authorities In Support of Mot. for Summary J. at 188.). As the Fink and Goldstein case files reflect, documents and information given to one prosecutor in the Los Angeles County District Attorney's were not likely to be

---

[9] It is noteworthy that, although defendant Collette submits Mr. Ross' declaration, Mr. Ross does not endorse Collette's claim that he met with Mr. Seifert and Mr.

conveyed to another prosecutor. Detective Collette and the other defendants were all experienced detectives. The jury could readily infer that they would have known that the District Attorney's Office prosecutors did not communicate with each other across cases. Moreover, the Supreme Court's *Giglio* decision—issued seven years before the McGinest murder investigation—should have put law enforcement on notice that they were required to ensure that information regarding benefits given to an informant in exchange for testimony needed to be delivered to the specific prosecutors using the informant as a witnesses. *Giglio v. United States*, 405 U.S. 150, 155 (1972). The Supreme Court made clear in *Giglio* that it was not a justification that the individual prosecuting the case did not know of the *Brady* information. A necessary corollary of that proposition is that those who have *Brady* information have a responsibility to get it to the appropriate prosecutor.

A reasonable officer in Collette's shoes would have realized that informant benefit information given to an informant in another case would not necessarily reach the line prosecutor in a District Attorney's office as large and dispersed as LA County's, and that part of his responsibility in was to ensure that the line prosecutor received that information, particularly where the officer was instrumental in obtaining the benefit. Collette is not entitled to qualified immunity.[10]

### G. DEFENDANT COLLETTE PROVIDED FINK WITH DETAILS ABOUT THE MURDER AND SUPPRESSED EVIDENCE THAT HE HAD DONE SO, THEREBY ASSISTING INFORMANT FINK WITH THE FABRICATION OF A FALSE CONFESSION.

---

Collette about the Fink deal.

[10] Further, even if one were to credit this argument, it would not entitle Defendant Collette to summary judgment. He did not bring a motion for partial summary judgment on certain specific claims, such as the Fink letter (Ex. 1026). He brought a summary judgment motion, and therefore the issue is whether he is entitled to be dismissed from the case, which requires that there be no evidence from which a jury could find him liable for any violation.

The evidence supports the inferences that: (1) after Collette's first interview of Fink, he sent Fink back to the jail to obtain more information or a confession from Goldstein; and (2) in preparation for this task Collette supplied Fink with details about the murder, including the information that McGinest was carrying a substantial amount of cash (*see* Plaintiff's Response to Collette's Statement of Uncontroverted Facts 23).

Because Goldstein did not make any statements to Fink about McGinest carrying money, it can be inferred that Fink received this information from Collette and used it to concoct a false confession that contained key facts necessary to advance law enforcement's theory of the crime as a robbery-murder. (*See* evidence listed in Plaintiff's Response to Collette's Statement of Uncontroverted Facts 23.) That such communications were not documented or disclosed establishes a *Brady* violation. Carlton Smith stated that the police provided him with this information (Plaintiff's Additional Material Facts ¶22.). This reinforces the inference that defendants supplied the same information to Fink.

Plaintiff contends that Collette was actually aware that Fink was likely to use the information about the crime supplied to him to add detail to the false confession he contrived, and thus violated Goldstein's due process rights by suborning Fink's perjury. However, even if Collette was not aware that Fink was lying about Goldstein's alleged confession – a proposition that plaintiff considers highly debatable – Collette failed to document and disclose to the prosecution and defense the fact that he had supplied details about the crime to Fink. This information was *Brady* material since it could have been used to impeach Fink's claim of receiving the information from Goldstein, and would have undermined the key prosecution contention that he could only have learned it from Goldstein.

**V.   A REASONABLE JURY COULD FIND DEFENDANT COLLETTE LIABLE FOR IMPROPERLY INFLUENCING THE IDENTIFICATION OF EYEWITNESS LORAN CAMPBELL AND SUPPRESSING EVIDENCE OF THIS IMPROPER INFLUENCE**

Collette denies any involvement in the interviews of Loran Campbell and on this basis contends that he is not liable for the *Mason*/*Biggers*[11] violations set out in Plaintiff's Third and Fourth Claims for Relief. (D. Collette's Memo of Points & Athorities in Support of Mot. for summary J., p.15.) However Campbell's testimony supports the inference that Detective Collette was one of the officers who participated in the photo-line up. (Plaintiff's Additional Material Facts ¶ 30.)[12] Because all justifiable inferences must be drawn in favor of the nonmoving party on summary judgment, *McSherry* 2009 WL 3353043, *4, there is clearly a genuine dispute of fact as to whether Collette participated in the interviews of Campbell. Even if Collette did not personally participate in the photo lineup—a position that Plaintiff disputes—he is responsible for *Brady* violations because as and investigator on the case he should have been aware of this issue but did not disclose it. See cases discussed at the beginning of the argument.

## VI.    CONCLUSION

For the forgoing reasons, the motion should be denied.

Dated: November 9, 2009          Respectfully submitted,

                                 LITT, ESTUAR, HARRISON & KITSON LLP
                                 KAYE, MACLANE & BEDNARSKI LLP


                                 By:__/s/ Barrett S. Litt_____
                                     Barrett S. Litt
                                     Attorneys for Plaintiff

---

[11] *See Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972).

[12] Although Campbell could not remember the name of the officer who was with Defendant Miller at the photo line up, Campbell testified that it was the officer who was with Miller on the night of the murder. Collette admits that he was with Miller on the night of the murder, and met Campbell at this time. (*See* evidence supporting Plaintiff's Additional Material Facts ¶ 30.)

24